**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

HEARTLAND ALLIANCE FOR HUMAN
NEEDS & HUMAN RIGHTS,
D/B/A NATIONAL IMMIGRANT
JUSTICE CENTER           :
            :
     Plaintiff,            :     Civil Action No.:    16-204 (RC)
            :
     v.            :     Re Document No.:    54, 56
            :
UNITED STATES IMMIGRATION &
CUSTOMS ENFORCMENT *et al.*,     :
            :
     Defendants.         :

## <u>MEMORANDUM OPINION</u>

### GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; GRANTING IN PART AND DENYING IN PART PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT

## I. INTRODUCTION

On December 18, 2015, President Barack Obama signed into law the Consolidated

Appropriations Act, 2016, which allocated federal funding for financial year 2016 for the federal

agency U.S. Immigrations and Customs Enforcement ("ICE"). *See* Am. Compl. ¶ 8, ECF No. 31

(citing Am. Compl. Ex. 1, ECF No. 31-1). The Consolidated Appropriations Act, 2016

stipulated that "funding made available under this heading *shall maintain* a level of not less than

34,000 detention beds. . . ." Am. Compl. Ex. 1 at 4 (emphasis added).[1] This statute thus

mandated that ICE "maintain" a minimum level of detention beds, thereby continuing a

requirement that was first included as a budgetary condition in 2009. *See* Am. Compl. ¶ 8; Am.

---

[1] Because the document itself is not paginated, the Court refers here to the ECF page number. Throughout this opinion, the Court uses the original page number if it is available and defaults to ECF numbering if not.

Compl. Exs. 3–6, ECF Nos. 31-3–31-6.  Since then, this requirement has been criticized by non-profit organizations and the national media on the grounds that ICE has construed "maintain" to mean "maintain *and fill*," Am. Compl. ¶ 8, the specified level of detention beds, such that the statute amounts to a "detention bed quota" or "detention bed mandate," *see generally* Am. Compl. Exs. 3–6 (compiling articles from Bloomberg News, Los Angeles Times, and New York Times that discuss and critique the quota).  According to such critics, the statute incentivizes ICE to fill a set number of beds in for-profit facilities as well as federal detention facilities, Am. Compl. ¶ 8, without considering factors such as "need," *id.* ¶ 10 (quoting Ex. 3), "low-cost alternatives to detention," *id.* ¶ 11 (quoting Ex. 5), whether the detainee is a violent offender, *id.* ¶ 12 (quoting Ex. 6), or the monetary cost of the policy, *id.* ¶ 13 (citing Ex. 7, ECF No. 31-7).

Plaintiff National Immigrant Justice Center ("NIJC") is among these critics.  Seeking to "obtain pertinent information to inform the legal community and the public about ICE detention, release, and bond policies and procedures," *id.* ¶ 14, NIJC submitted two FOIA requests in 2014 that sought production of records both from ICE and from the Office of Management and Budget ("OMB), respectively.  As detailed below, Plaintiff submitted two further FOIA requests in 2017 to ICE and OMB.  *Id.* ¶¶ 15, 24.  Before and since the complaint in this matter was filed, ICE and OMB have searched for and produced records responsive to these FOIA requests.  Throughout, NIJC has criticized aspects of the agencies' searches and challenged the basis for their withholding of certain records in whole or in part.

Defendants ICE and OMB now move for summary judgment on Plaintiff's claim.[2]  *See* Defs.' Mot. Summ. J., ECF No. 54.  Plaintiff opposes this motion and has filed a cross-motion

_____

[2] Defendants move for summary judgment on Plaintiff's claim under FOIA.  Plaintiff also makes several claims under the Administrative Procedure Act, *see* Am. Compl. ¶¶ 54–59, 68–73.  Because neither parties' filings address these claims, the Court will not analyze them here.  The

for summary judgment.  *See* Pl.'s Cross-Mot. Summ. J., ECF No. 56.  For the reasons set forth

below, the Court will grant in part and deny in part Defendants' motion for summary judgment

and grant in part and deny in part Plaintiff's cross-motion for summary judgment.

## II.  FACTUAL BACKGROUND

Because the FOIA searches in this case were conducted piecemeal over a period of over

four years and the adequacy of Defendant ICE's searches is central to this suit, the Court will

begin by detailing both the FOIA requests submitted to ICE and the responsive searches

conducted by the agency.[3]

### A.  Procedural History for 2014 FOIA Requests

On July 1, 2014, Plaintiff submitted two FOIA requests to ICE and OMB, respectively.[4]

Am. Compl. ¶¶ 15, 24.  NIJC's requests sought to determine "whether ICE has adopted uniform

detention, release, and bond policies that are independent from the bed space inventory and/or

from ICE quotas or performance objectives."  *Id.* ¶ 14.

---

Court notes, however, that other courts in this Circuit have "uniformly declined jurisdiction over
APA claims that"—like Plaintiff's claims—"sought remedies made available by FOIA."
*Feinman v. F.B.I.*, 713 F. Supp. 2d 70, 76 (citing *Kenney v. U.S. Dep't of Justice,* 603 F.Supp.2d
184, 190 (D.D.C. 2009); *People for the American Way Found. v. Nat'l Park Serv.,* 503 F. Supp.
2d 284, 308–09 (D.D.C. 2007); *Edmonds Inst. v. U.S. Dep't of the Interior,* 383 F. Supp. 2d 105,
111–12 (D.D.C. 2005) (citations omitted).

[3] Because the adequacy of Defendant OMB's search is not at issue, the Court will not
specifically describe it except insofar as it bears on the adequacy of Defendant ICE's search.

[4] Although the complaint also names the Department of Homeland Security ("DHS") as a
Defendant, DHS indicated that "it has no record of having received a FOIA request from
Plaintiff."  Status Report (Nov. 22, 2016) 3, ECF No. 24.  Because neither Defendants' motion
for summary judgment nor Plaintiff's cross-motion raises any considerations regarding
Defendant DHS (separately than in its capacity as the Department of which ICE is a component),
the Court does not address DHS in resolving the instant motions.

## 1. 2014 FOIA Request to ICE

The ICE FOIA request, 2014-ICFO-02072, sought two categories of records. The first prong of the request centered on two ICE field offices, namely ICE's San Antonio and Seattle Areas of Responsibility ("AORs").[5] Am. Compl. Ex. 8, ECF No. 31-8; *see also* Defs.' Statement Undisputed Material Facts ¶ 1, ECF No. 54-1. In this prong, NIJC sought:

- "daily, weekly, bi-weekly, and/or monthly Records of the bed space inventory in ICE's San Antonio and Seattle AORs from June 1, 2013 through November 30, 2013, including the number of vacant beds and the detainee population, broken down by gender, individuals subject to mandatory custody, individuals subject to non-mandatory custody, and by the alleged custodial authority (e.g., INA §§ 236(a), 236(c), 241, 235);"

- "daily, weekly, bi-weekly, and/or monthly Records of bond amounts for detainees in ICE's San Antonio and Seattle AORs from June 1, 2013 through November 30, 2013, including the detainee's gender, whether the individual was subject to mandatory custody, and the alleged custodial authority for each individual (e.g., INA §§ 236(a), 236(c), 241, 235);" and

- "any Records concerning the setting and calculation of bond amounts for detainees in ICE's San Antonio and Seattle AORs from June 1, 2013 to the present, (including but not limited to) all communications (e.g., transmittals, letters, emails, memoranda, and reports, instructions, and summaries) related thereto." Am. Compl. Ex. 8 at 3–4 (emphasis omitted).

---

[5] Plaintiff's 2014 FOIA request explains that "the term 'AOR' means the geographic area of responsibility under the authority of an ICE field office." Am. Compl. Ex. 8 at 1 n.2. For consistency and clarity, the Court adopts this term. Unless otherwise indicated, the Court uses the terms "field office" and "AOR" interchangeably.

The second prong of the request expanded beyond these two AORs and sought four kinds of records regarding nationwide ICE-related detention (the "Detention Bed Quota"):

- "any Records dated between January 1, 2009 and the present which set out or reflect approved policies, guidelines, or procedures for maintaining and/or filling (i) a level of not less than 33,400 detention beds and/or (ii) a level of not less than 34,000 detention beds, including all communications (e.g., transmittals, letters, emails, memoranda, and reports, instructions, and summaries) related thereto (such as to, from, or within ICE headquarters, an ICE field office, or an ICE AOR);"

- "any Records dated between January 1, 2009 and the present which set out or reflect an assessment of compliance with any statutory requirement for maintaining and/or filling (i) a level of not less than 33,400 detention beds and/or (ii) a level of not less than 34,000 detention beds;"

- "any Records from January 1, 2009 through the present which set out or reflect approved policies, guidelines, or procedures for appraising the performance of ICE personnel, Field Offices, or AORs related to maintaining and/or filling beds in detention facilities used to house ICE detainees;" and

- "any Records from January 1, 2009 through the present which set out or reflect approved policies, guidelines, or procedures for requesting and/or setting and/or calculating bond amounts for apprehended and/or detained individuals based on the presence of vacant beds in an ICE detention facility."  *Id.* at 4 (emphasis omitted).

ICE acknowledged receipt of this FOIA request on July 10, 2014, *see* Am. Compl. Ex. 9, ECF No. 31-9, and issued a "final response" to Plaintiff on February 19, 2015, *see* Am. Compl. Ex. 10, ECF No. 31-10.

2. ICE's First Search in Response to the 2014 FOIA Request[6]

According to declarations provided by the agency, ICE identified the records initially released to Plaintiff after applying its "standard procedures for initiating searches in response to FOIA requests." Declaration of Toni Fuentes in Support of Defs.' Mot. Summ. J. ("Fuentes Decl.") 5, ECF No. 54-2. After initial processing of Plaintiff's request, "the ICE FOIA Office determined that ICE's Office of Enforcement Operations (ERO) was the program office likely to have responsive records." *Id*. ¶ 32. Following standard procedure, ERO submitted the request to its Information Disclosure Unit (IDU). *Id.* ¶ 34. The ERO's IDU reviewed Plaintiff's request and, "based on subject matter expertise and knowledge of the program officers' activities," determined that it was appropriate to conduct searches for potentially responsive documentation at the ERO Field office in San Antonio and the ERO Field Office in Seattle. *Id.* ¶¶ 34–35.

*a. Seattle Field Office Search*

Upon receipt of this directive, the designated FOIA point of contact in the ERO's Seattle Field Office tasked the Deputy Field Office Director (DFOD) with conducting relevant searches. *Id.* ¶ 36. The DFOD is responsible for "supervis[ing] the ERO Seattle Office enforcement of U.S. immigration law and agency policies," including, *inter alia*, policies related to the "calculation and setting of bond amounts[] within the state of Washington." *Id.* The DFOD conducted a search of his email and Microsoft Outlook archive folders. *Id.* He used the following search terms: "'34,000,' 'filling beds,' 'Vacant beds,' '33,400 mandate,' 'detention beds,' and 'bond amounts.'" *Id.*

---

[6] The following summary of ICE's first search in response to NICJ's 2014 FOIA request addresses only AOR searches because the filings before the Court do not explain what searches, if any, ICE initially conducted for records responsive to the second prong of Plaintiff's 2014 FOIA request, which sought records regarding ICE's nationwide detention policy.

*b. San Antonio Field Office Search*

The San Antonio AOR separately conducted a search in response to the ICE FOIA Office's tasking. The ERO San Antonio Field Office tasked its Assistant Field Operations Director (AFOD), four Supervisory Detention and Deportation Officers (SDDOs), and two Deportation Officers. *Id.* ¶ 37. The AFOD "oversees the day-to-day operations of the field office," including legal and policy enforcement "as they pertain to the setting and the calculation of bond amounts." *Id.* The SDDOs' duties include "approv[al of] bonds and provid[ing] guidance relating to any changes in the bond policies." *Id.* The Deportation Officers "handl[e] their individual assigned cases," including bond determinations. *Id.* These employees, once tasked, "collectively searched" both their Outlook email accounts and the "office's shared (S) Drive" with the search term "Bond." *Id.*

### 3. ICE's First Production and Plaintiff's Administrative Appeal

After both field offices completed their searches, ICE's FOIA Office notified Plaintiff on February 19, 2015, that its "search for responsive records produced 387 pages and 123 Excel spreadsheets," of which portions of 247 pages were withheld pursuant to FOIA Exemptions. *Id.* ¶ 8; *see also* Defs.' Mot. Summ. J. 33, Ex. C, ECF No. 54-2. Plaintiff timely filed an administrative appeal on April 19, 2015, arguing that ICE's response was "deficient" and contesting "the withholding of any records, in part or in their entirety, without a *Vaughn* index;" the withholding of 35 pages "in their entirety based on a blanket assertion of exemptions and/or without any meaningful explanation," and the "incomplete search performed by the agency." Am. Compl. Ex. 11 at 2–3, ECF No. 31-11.

This administrative appeal included arguments addressing both prongs of the 2014 FOIA request. Regarding the first prong, NCIJ contended that the agency's search of the San Antonio

and Seattle AORs had three deficiencies: (1) the responsive records failed to include particular kinds of records, such as, among other omissions, "records disclosing its maximum space capacity;" (2) the responsive records did not address "bond amounts for detainees" in either of the AORs; and (3) the responsive records regarding the "setting and calculation of bond amounts" omitted salient communications for the San Antonio AOR and failed to include "any communications from the Seattle AOR." *Id.* at 3–4. NCIJ contested the second prong as well, arguing that the agency's search for records regarding nationwide ICE-related detention was inadequate because ICE produced minimal (four documents totaling eight pages) or no records in response to the discrete items identified in its FOIA request. *Id.* Plaintiff suggested that there were in fact responsive records not included in the agency's production, pointing to public records such as an August 2014 report by the Department of Homeland Security Office of the Inspector General that "repeatedly discuss[ed] records relevant to the FOIA Request." *Id.* at 4.

In response to this administrative appeal, Defendant ICE "determined that a new search(es) or modifications to existing search(es) could be made and it remanded the appeal to the ICE FOIA Office" for supplementary processing and re-tasking. Defs.' Statement of Undisputed Material Facts ("Defs.' SMF") 2, ECF No. 54-1 (citing Defs.' Mot. Summ. J. 58, Ex E, ECF No. 54-2).

### 4. ICE's Supplemental Search in Response to the 2014 FOIA Request

In response to NIJC's April 19, 2015, administrative appeal, the ICE FOIA Office wrote Plaintiff on May 15, 2015. Am. Compl. Ex. 13, ECF No. 31-13. In response to Plaintiff's administrative appeal, ICE FOIA had determined that ERO should "conduct new or modif[ed] . . . search(es)." Fuentes Decl. ¶ 40; *see also* Am. Compl. Ex. 13 at 3. "Specifically, the ICE FOIA Office instructed ERO to task the Office of Principal Legal Advisors (OPLA), the ICE's Office

of Deputy Director, the ICE's Office of Director, the Office of Chief Financial Officer, ERO,

and the Seattle [Field] Office [Field Office Director]." Fuentes Decl. ¶ 40. ICE's filings do not

further detail who conducted these searches, which search terms were used, or the date ranges

that were applied for these searches. ICE subsequently produced further documents, totaling 732

pages and 127 Excel spreadsheets as of August 11, 2016. Declaration of Fernando Pineiro

Pursuant to Court Order ("Pineiro Decl.") ¶ 20, ECF No. 19-1. [7]

### 5. Filing of FOIA Civil Suit

As mentioned previously, Defendant ICE notified Plaintiff on May 15, 2015, that it

would be conducting further searches in response to NIJC's administrative appeal. *See* Am.

Compl. Ex. 13. On February 5, 2016, no further records having been produced, Plaintiff filed the

instant FOIA suit. *See* Compl. After a hearing before the Court and submission of additional

declarations by both agencies, the Court ordered OMB to process further records and directed

ICE to explain whether it believed any further searches were necessary. Order (Nov. 8, 2016),

ECF No. 23. On November 22, 2016, Defendant ICE stated that it was conducting further

---

[7] In addition to these pages were records referred to ICE by OMB that OMB had located
in its own independent search, which it conducted in response to Plaintiff's separate 2014 FOIA
request to OMB. *See* Pineiro Decl. ¶ 20; *see also* Defs.' Mot. Summ. J. 98, Ex. G, ECF No. 54-2
(September 9, 2014, letter from OMB discussing "two documents, totaling six pages" that
originated with Defendant ICE and which Defendant OMB referred to ICE). ICE withheld these
pages in full pursuant to FOIA Exemption 5. *See id.* at 103, Ex. I, ECF No. 54-2. Plaintiff
appealed this withholding as a constructive denial of records by ICE, characterizing this filing as
a supplemental appeal regarding the 2014 FOIA request to ICE. *Id.* at 100. However, the initial
ICE searches and the initial OMB searches were each assigned a different FOIA processing
number, and the documents that were referred to ICE were associated with the OMB processing
number. *Id.* ICE sent its "final response" regarding disposition of the records associated with
the OMB processing numbers on November 6, 2014. *Id.* at 102. Plaintiff's appeal on grounds of
constructive denial was received on June 1, 2015. *Id.* at 100. Because ICE regulations require
appeals from an adverse agency determination to be received within 60 days, and because
Plaintiff's appeal was received outside of this window, ICE administratively closed this appeal.
*Id.* (citing 6 C.F.R. § 5.9(a)(1) (2015)); *see also* Pineiro Decl. ¶¶ 11–14.

review and processing of potentially responsive records. *See* Status Report (Nov. 22, 2016). ICE also indicated that the parties were "working on clarifications regarding plaintiff's request," with an eye to "specific Bates-numbered documents where the plaintiff indicated that other records may exist based on these documents." *Id.* at 1–2. However, this issue remained unresolved, and NIJC continued to contest the scope of ICE's search. In particular, Plaintiff asserted that Defendants' searches used improper cut-off dates. *See* Joint Status Report (Feb. 9, 2017) at 5, ECF No. 25. NIJC also contested both agencies' withholdings in the parties' February 9, 2017 Joint Status Report. *See id.*

On that same day, in furtherance of its argument that the documents produced to date had become "stale," *id.* at 7, NIJC submitted two new FOIA requests with Defendant ICE (2017-ICFO-15562) and Defendant OMB (2017-069), respectively. Plaintiff's 2017 FOIA requests were, in all relevant respects, identical to the 2014 FOIA requests.[8] *See* Am. Compl. ¶¶ 32, 34. Each search request again sought two categories of records: prong one sought information regarding ICE's San Antonio and Seattle AORs and prong two sought information regarding nationwide ICE-related detention (the "Detention Bed Quota"). *See id.* ¶¶ 15, 24. The 2017 request for records regarding the "Detention Bed Quota" covered the same four kinds of records as the 2014 request.[9] The difference between the requests was the time period covered: the

---

[8] The sole substantive discrepancy is that the 2014 request included two search requests for the Seattle and San Antonio AORs that were not repeated in the 2017 request. *Compare* Ex. A, ECF No. 54-2 (making three records requests regarding AORs) *with* Ex. J, ECF No. 54-2 (making one records request regarding AORs). The agency's declarations do not separate out this component, nor does Plaintiff at any point contest it, and so the Court considers the requests identical in all material ways.

[9] These four items are enumerated as items (2) to (5) in Plaintiff's February 9, 2017 FOIA request, *see* Defs.' Mot. Summ. J. 107, Ex. J, ECF 54-2, and referenced as "Plaintiff's FOIA request item numbers 2-5" in Defendants' motion for summary judgment, *id.* at 9. They are substantively identical to the four items enumerated as items (4) to (7) in the July 1, 2014 FOIA Request, *see id.* at 45, Ex. A, that are reproduced in full above, *see supra* Part II.A.1.

February 9, 2017 FOIA requests updated the timeframe of the search to cover records originating between July 2, 2014, and February 9, 2017. *Id.* ¶¶ 32, 34. Accordingly, read together, NIJC's two FOIA requests sought nationwide records for the period between January 1, 2009 and the submission of the second FOIA request on February 9, 2017.

Because the adequacy of Defendant ICE's searches is central to the pending motions, the Court will next describe the searches conducted by the agency in response to the 2017 FOIA request submitted to ICE.

### 6. ICE's Searches in Response to 2017 FOIA Request

Upon review of NIJC's 2017 FOIA request, the ICE FOIA Office initially tasked five program offices with searches for potentially responsive records: the Office of Enforcement and Removal Proceedings (ERO), the Office of Detention Policy and Planning (ODPP), the Office of the Director, the Office of Congressional Relations (OCR), and the Office of Diversity and Civil Rights (ODCR). *See* Fuentes Decl. ¶ 42; Supp. Fuentes Decl. ¶ 10. The ICE ERO also determined that the ERO Seattle and San Antonio Field Offices should search for potentially responsive records. Fuentes Decl. ¶ 43.

On August 9, 2018, as the parties prepared to file motions for summary judgment, Defendants moved for a temporary stay to permit ICE to conduct two additional searches. *See* ECF No. 51. The Court granted this stay, *see* Minute Order (Aug. 9, 2018), and ICE agreed to extend the date range of its searches, *see* Pl.'s Mem. Opp'n 4. Pursuant to this agreement, as detailed below, ICE expanded its search to cover June 1, 2013 to August 1, 2018, for the first prong of the request—appearing in both the 2014 and 2017 FOIA submissions—in which NIJC sought "any Records concerning the setting and calculation of bond amounts for detainees in

ICE's San Antonio and Seattle [Areas of Responsibility ("AORs")]."  Watkins Decl. Ex. 1, ECF

No. 56-3; *see also* Pl.'s Statement of Material Facts (" Pl.'s SMF") ¶ 1, ECF No. 56-7.

### a.  Searches of ERO Seattle Field Office

Upon receipt of the 2017 FOIA request, the ERO Seattle Field Office tasked the Acting

Field Operations Director (AFOD) with conducting a search.  Supp. Fuentes Decl. ¶ 44.  The

AFOD "performs the duties of the FOD," manages field office employees, and "ensur[es] that

the Seattle office enforces" all immigration laws "in accordance with the agency's policies and

directives," including those related to "calculation and setting of bonds."  *Id.*  The ERO Seattle

Field Office's AFOD conducted a search of his email account.  *Id.*  He searched for the terms

"detention beds" and "bed quota."  *Id.*  Because the AFOD reported to the ICE FOIA Office

"that all potentially responsive records relating to bond calculations were previously produced"

in response to the 2014 FOIA request, *id.*, this search did not result in any "additional records for

setting bond amounts or bond calculations in the Seattle [Field] Office."  *Id.*

Subsequently, in approximately July 2018, the Seattle Field Office conducted a new

search using the time frame of June 1, 2013 to August 1, 2018.  *Id.* ¶ 46.  In this iteration of the

search, the Seattle Field Office tasked the Acting FOD, four Assistant FODs (AFODs), the

Deputy Field Operation Director (DFOD), and seventeen Supervisory Detention and Deportation

Officers.  *Id.* ¶ 47.  Each of these employees searched their individual outlook email accounts,

their individual computer folders, and the office's shared drive.  *Id.*  "[U]sing the search function

of their outlook email account and their computers," these individuals conducted queries with

terms that included, but "were not limited to: 'bonds,' 'bond amount,' 'minimum bond amount,'

'bed mandate,' 'adult detention,' and 'minimum monthly bond amount.'"  *Id.*  Potentially

responsive records were sent to the ICE FOIA Office, *id.*, and released to Plaintiff on September 13, 2018, *id.* ¶ 49.

### b. Search of ERO San Antonio Field Office

The ERO San Antonio Field Office also conducted a search, tasking its AFOD as the individual "reasonably likely to have responsive records." *Id.* ¶ 45. The ERO San Antonio Field Office's AFOD is responsible for supervising the daily ERO operations "of an eighteen-county area in and around San Antonio, Texas," and for managing 80 employees. *Id.* Using the search terms "bond" and "bond determination," he searched three locations: his desktop computer, the office's shared drive, and his email account. *Id.* The AFOD reported that "he was unable to locate any responsive records pertaining to Plaintiff's FOIA request" for records regarding the nationwide detention policy (prong two) and forwarded other potentially responsive records to the main ICE FOIA office. *Id.*

The San Antonio Field Office also conducted further searches in mid-2018 in response to Defendants' litigation review. *Id.* ¶ 48. This search, like the Seattle Field Office search, was adjusted to cover the time frame from June 1, 2013 to August 1, 2018. *Id.* ¶ 46. The San Antonio Field Office tasked its FOD, ten Assistant FODs, three Deputy FODs, and forty-seven Supervisory Detention and Deportation Officers, *id.* ¶ 48. These individuals each searched their own Outlook email accounts and computer folders as well as the office's shared drive. *Id.* The search terms used were: "'bonds,' 'bond amount,' 'minimum bond amount,' 'bed mandate,' 'adult detention,' and 'minimum monthly bond amount.'" *Id.* After review and processing by the ICE FOIA Office, responsive records were released to Plaintiff on September 13, 2018. *Id.* ¶ 48.

### c. Search of Program Offices

As indicated previously, upon review of NIJC's 2017 FOIA request, ICE's FOIA Office directed both the Seattle and San Antonio field offices and five program offices to search for records regarding the "[b]ed [m]andate in general." *See* Supp. Fuentes Decl. ¶¶ 8, 10. The program offices deemed likely to have responsive records were the Office of Enforcement and Removal Proceedings (ERO), the Office of the Deputy Director, the Office of Detention Policy and Planning (ODPP), the Office of Congressional Relations (OCR), and the Office of Diversity and Civil Rights (ODCR). *See* Fuentes Decl. ¶ 42; Supp. Fuentes Decl. ¶ 10. The Court will next describe each of these program office searches. For these searches, the record before the Court describes only a single round of searches, as detailed below. There is no evidence that the parties agreed to update the search period regarding the second prong of the request, covering nationwide ICE policy, to include the time up to August 1, 2018, in a manner parallel to the updated time frame applied to the first prong of the request, concerning the AORs.

### i. ERO Searches

ERO's search consisted of referrals to the Seattle and San Antonio Field Offices, Fuentes Decl. ¶ 43, and to three sub-components at the headquarters level that were identified by ERO IDU, Supp. Fuentes Decl. ¶ 11. The declarations provided by ICE do not describe any ERO field office searches other than those discussed previously.

The first ERO sub-component tasked with conducting a search was the ERO Field Operations Division (FOPS). *Id.* FOPS was tasked because of its role in guiding and coordinating the 24 ERO field offices and associated sub-offices throughout the country. *Id.* ¶ 12. Within this sub-component, the Domestic Operations Division, which "oversees, directs, and coordinates all ERO Field Operations activities throughout the nation's field offices and

suboffices," *id.* ¶ 13, was charged with conducting a search. The Domestic Operations Division determined that the Unit Chief should carry out the search because of his status as a direct reportee to the ERO's Deputy Director and his responsibility for "coordinating all the field offices' operations and activities." *Id.* The Unit Chief searched his Outlook email account using the terms "bond calculation" and "Bed detention quota." *Id.*

The second sub-component tasked with conducting a search was the Custody Management Division (CMD), which "provid[e]s policy and oversight" for the daily "administrative custody of more than 33,000 detainees." *Id.* ¶ 15. The CMD Executive Assistant Director (EAD), who oversees ICE's detention operations, was tasked with the search. *See id.* The EAD did not conduct any searches because he determined that a search would not be "reasonably likely to locate any potentially responsive records" regarding the second prong of the 2017 FOIA request and "deferred" to the ERO FOPs for the remaining items. *Id.*

The final ERO sub-component tasked with conducting a search was the ERO Executive Associate Director's Office. *Id.* ¶ 14. This "central tasking and correspondence unit" is responsible for "all incoming/outgoing requests for information" from individuals both inside and outside of the agency. *Id.* In this office, the EAD, who "leads the ERO in its mission" regarding identification, arrest, and removal of aliens who threaten national security or public safety, conducted a search. *Id.* The ERO EAD searched his Outlook email using the "find function" for the terms "detention bed quota," "Detention beds," "beds," "Bond Seattle," "Bond San Antonio," "Bed Quota," and "Bond Calculation." *Id.* The EAD sent potentially responsive records to the ICE FOIA Office for further processing. *Id.*

## ii.  Office of the Deputy Director Searches

In addition to the ERO, the HQ-level Office of the Deputy Director was also tasked with conducting a search.  *Id.* at 5.  The Office of the Deputy Director is located within ICE's Office of the Director, which manages ICE's daily operations, 20,000 personnel across over 400 offices, and nearly $6 billion budget.  *Id.* ¶ 16.  Within the Office of the Deputy Director, two focal points for the search were identified.  First, the Deputy Director was deemed "reasonably likely" to have responsive records due to his responsibility for "oversight of daily operations within ICE" and management of "operational and mission support personnel" in both domestic and international offices.  *Id.* ¶ 17.  The Special Assistant to the Deputy Director was tasked with conducting the search of the Deputy Director's files because of his "subject matter expertise and knowledge" of the office.  *Id.*  The Special Assistant searched the Deputy Director's email account with the Outlook search function, querying for the terms "Beds," "Detention," "Bed space," and "34,000."  *Id.*  Second, the Acting Deputy Director's files were searched.  *Id.* ¶ 18.  To conduct this search, the Special Assistant to the Acting Deputy Director used the Outlook search function of the Acting Deputy Director's email account to search for the terms "Bond Calculation," "Detention bed quota," and "Bond Calculation and Detention Bed Quota."  *Id.*  For both searches, potentially responsive records were sent to the ICE FOIA Office for processing. *Id.*

## iii.  ODPP, ODCR, and OCR Searches

The final three ICE offices that were initially tasked by ICE's FOIA Office did not, in the end, conduct any searches.  Within the ODPP, which "is charged with designing a detention system that meets the unique needs of ICE's detained population," *id.* ¶ 19, the Unit Chief determined that the ODPP was "not likely t[o] posess any responsive records," *id.* ¶ 20.  The

Unit Chief indicated that the ODPP focuses on issues such as the providing of adequate health care to alien detainees, exercising fiscal prudence in any detention reforms, and ensuring federal oversight, and thus concluded that other operation program offices, such as ERO, were likely to possess the requested information. *Id.* The ODCR, whose mission is to "ensure that the rights of employees and applicants are protected," *id.* ¶ 21, made a similar determination, *id.* ¶ 22. The ODCR Division Chief notified the ICE FOIA Office of this conclusion, stating that "it would not be reasonably likely to possess any responsive records" and suggesting that operational program offices like ERO were likely to possess the requested information. *Id.* Finally, the Chief of Staff of ICE OCR, which "serves as the central point for oversight, administration, and coordination of ICE federal congressional activity," drew the same conclusion. *Id.* ¶¶ 23–24. Accordingly, the Chief of Staff indicated to the ICE FOIA Office that the OCR "was not likely to possess any responsive records" and also pointed to "operational program offices, such as ERO," as likely to possess the requested information. *Id.* ¶ 24.

### 7. Failure to Resolve Issues in Dispute

On September 13, 2018, ICE transmitted "an interim response" along with the records deemed responsive to the supplemental searches of the Seattle and San Antonio Field Offices. *See* Joint Status Report (Sept. 14, 2018) at 1–2, ECF No. 52. The agency produced 40 pages, which were given Bates numbers 2016-ICLI-00019 6937 through 2016-ICLI-00019 6976. *Id.* at 2. Portions of these pages were withheld pursuant to FOIA Exemptions 5, 6, 7(C), and 7(E). *Id.* The portion of the interim report reproduced in the parties' September 14, 2018 Joint Status Report does not discuss the results of the program office searches or provide additional detail, nor is this report included in the parties' filings. The agency represents that, as of September 13, 2018, it had "completed its searches and produced all potentially responsive records." *Id.*

Following this transmission, further efforts to reach agreement on the adequacy of ICE's search proved unavailing. Defendants now move for summary judgment and ask the Court to dismiss Plaintiff's action with prejudice. NIJC opposes this motion and has filed a cross-motion. Plaintiff's cross-motion argues that ICE failed to justify the scope of its search regarding the "Detention Bed Quota," and that both ICE and OMB did not adequately justify their "failure to provide segregable portions of the withheld records." Pl.'s Mem. Opp'n Summ. J. and Cross-Mot. Summ. J. 11–12 ("Pl.'s Mem. Opp'n"), ECF No. 56-1. Plaintiff also seeks an order directing Defendant ICE to provide a *Vaughn* Index to justify its withholdings regarding the setting and calculation of bond amounts. *See* Pl.'s Cross-Mot. Summ. J.

## III. LEGAL STANDARD

Congress enacted FOIA to permit citizens to discover "what their government is up to." *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 773 (1989) (quoting *EPA v. Mink*, 410 U.S. 73, 105 (1973) (Douglas, J. dissenting)). FOIA operates via several steps. First, upon an agency's receipt of a request that "reasonably describes" records being sought, 5 U.S.C. § 552(a)(3)(A), the agency must "conduct[ ] a search reasonably calculated to uncover all relevant documents." *Weisberg v. U.S. Dep't of Justice*, 705 F.2d 1344, 1351 (D.C. Cir. 1983). Then, FOIA requires the agency to disclose responsive records revealed by the search, unless material in the records falls within one of FOIA's nine statutory exemptions. 5 U.S.C. § 552(b); *see also Judicial Watch, Inc. v. U.S. Dep't of Def.*, 847 F.3d 735, 738 (D.C. Cir. 2017) ("The Act requires government agencies to make information available upon request, unless the information is protected by one of nine statutory 'exemptions."").

"FOIA cases typically and appropriately are decided on motions for summary judgment." *Pinson v. Dep't of Justice*, 236 F. Supp. 3d 338, 352 (D.D.C. 2017) (quoting *Defs. of Wildlife v. U.S. Border Patrol*, 623 F. Supp. 2d 83, 87 (D.D.C. 2009)). A court addressing a motion for

summary judgment in a FOIA suit is to review the matter *de novo*. *See* 5 U.S.C. § 552(a)(4)(B); *Life Extension Found., Inc. v. IRS*, 915 F. Supp. 2d 174, 179 (D.D.C. 2013). In general, summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact is one capable of affecting the substantive outcome of the litigation. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" if there is enough evidence for a reasonable factfinder to return a verdict for the non-movant. *See Scott v. Harris*, 550 U.S. 372, 380 (2007). In a FOIA case, "summary judgment is appropriate if there are no material facts genuinely in dispute and the agency demonstrates 'that its search for responsive records was adequate, that any exemptions claimed actually apply, and that any reasonably segregable non-exempt parts of records have been disclosed after redaction of exempt information.'" *Prop. of the People, Inc. v. Office of Mgmt. and Budget*, 330 F. Supp. 3d 373, 380 (D.D.C. 2018) (quoting *Competitive Enter. Inst. v. EPA*, 232 F. Supp. 3d 172, 181 (D.D.C. 2017)).

The reviewing court may grant summary judgment based on the record and agency declarations if "the agency's supporting declarations and exhibits describe the requested documents and 'the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith.'" *Pronin v. Fed. Bureau of Prisons*, No. CV 17-1807, 2019 WL 1003598, at *3 (D.D.C. Mar. 1, 2019) (quoting *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009) (internal citation omitted)). An agency's "[c]onclusory and generalized allegations of exemptions" are not sufficient justification. *Morley v. Cent. Intelligence Agency*, 508 F.3d 1108, 1114–15 (D.C. Cir.

2007) (internal citations omitted); *see also Pinson v. Dep't of Justice*, 313 F. Supp. 3d 88, 106 (D.D.C. 2018). "Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'" *Scudder v. Cent. Intelligence Agency*, 254 F. Supp. 3d 135, 140 (D.D.C. 2017) (quoting *Judicial Watch*, 715 F.3d at 941 (internal citations omitted)). A reviewing court should respect an agency's expertise and not "overstep the proper limits of the judicial role in FOIA review." *Hayden v. Nat'l Sec. Agency/Cent. Sec. Serv.*, 608 F.2d 1381, 1388 (D.C. Cir. 1979).

## IV. ANALYSIS

Plaintiff argues that there are three deficiencies in Defendants' response to its FOIA requests: (1) the adequacy of ICE's searches in response to Plaintiff's 2017 FOIA request for records regarding the nationwide detention policy; (2) improper application of FOIA exemptions by Defendant ICE; and (3) improper application of FOIA exemptions by Defendant OMB. *See generally* Pl.'s Mem. Opp'n. For the reasons set forth below, the Court finds that the agency's search in response to Plaintiff's 2017 FOIA request for records regarding the AORs (prong one) is adequate, but the scope of its search regarding the nationwide detention policy (prong two) cannot be found adequate based on the documentation that the government has submitted to date. The Court additionally concludes that, for *both* the 2014 and 2017 FOIA requests, ICE has not met its burden to establish the adequacy of its searches for records regarding the nationwide detention policy (prong two). The Court further finds that Defendant ICE has not sufficiently carried its burden regarding the agency's application of FOIA exemptions, but Defendant OMB has sufficiently carried its burden regarding the agency's application of FOIA exemptions. Accordingly, the Court grants in part and denies in part Defendants' motion for summary judgment and grants in part and denies in part Plaintiff's cross-motion for summary judgment.

## A. Adequacy of ICE's FOIA Searches

Defendants aver that ICE has conducted an adequate search for responsive documents and has thereby discharged its responsibility under FOIA, such that summary judgment in ICE's favor is appropriate. NIJC disagrees. Plaintiff's cross-motion for summary judgment argues that ICE has not carried its burden to establish that the scope of its search was adequate, *see* Pl.'s Resp. to Defs.' Statement of Undisputed Material Facts ("Pl.'s Resp. Defs.' SMF"), ECF No. 56-6, and that, specifically, ICE's search in response to its February 9, 2017 FOIA request was inadequate with regard to the nationwide "bed mandate in general," Pl.'s Mem. Opp'n 12 (quoting Joint Status Report (Feb. 13, 2018) (emphasis omitted)).

"An agency fulfills its obligations under FOIA to conduct an adequate search 'if it can demonstrate beyond material doubt that its search was 'reasonably calculated to uncover all relevant documents.'" *Canning v. United States Dep't of State*, 346 F. Supp. 3d 1, 13 (D.D.C. 2018) (quoting *Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d 321, 325 (D.C. Cir. 1999) (internal citation omitted)); *see also Morley*, 508 F.3d at 1114. For a search to be reasonably calculated to uncover all relevant documents, the agency does not need to search "every record system" for the requested documents. *Marino v. Dep't of Justice*, 993 F. Supp. 2d 1, 9 (D.D.C. 2013) (citing *Oglesby v. U.S. Dep't of the Army*, 920 F.2d 57, 68 (D.C. Cir. 1990)). Nor must the agency's search be perfect. *Meeropol v. Meese*, 790 F.2d 942, 956 (D.C. Cir. 1986). But the agency must show that it "conduct[ed] a good faith, reasonable search of those systems of records likely to possess the requested records." *Pinson v. U.S. Dep't of Justice*, 177 F. Supp. 3d 56, 80 (D.D.C. 2016) (quoting *Marino*, 993 F. Supp. 2d at 9 (internal citation omitted)); *see also Oglesby*, 920 F.2d at 68.

"To prevail on summary judgment, the agency must submit declarations that 'denote

which files were searched, [and] by whom those files were searched, and [that] reflect a systematic approach to document location.'" *Canning*, 346 F. Supp. 3d at 14 (quoting *Liberation Newspaper v. U.S. Dep't of State*, 80 F. Supp. 3d 137, 144 (D.D.C. 2015) (internal citation and quotation marks omitted)); *see also Baker & Hostetler LLP v. U.S. Dep't of Commerce*, 473 F.3d 312, 318 (D.C. Cir. 2006); *Steinberg v. Dep't of Justice*, 23 F. 3d 548, 552 (D.C. Cir. 1994); *Oglesby*, 920 F.2d at 68. Once the agency has provided a "reasonably detailed" declaration describing its search, the burden shifts to the FOIA requester to produce "countervailing evidence" suggesting that a genuine dispute of material fact exists as to the adequacy of the search. *Morley*, 508 F.3d at 1116. An agency's declarations "are accorded a presumption of good faith, which cannot be rebutted by 'purely speculative claims about the existence and discoverability of other documents.'" *SafeCard Servs., Inc. v. Secs. and Exchange Commission*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (quoting *Ground Saucer Watch, Inc. v. Cent. Intelligence Agency*, 692 F.2d 770, 771 (D.C. Cir. 1981)). However, if the record raises substantial doubts regarding the agency's efforts, "particularly in view of well[-]defined requests and positive indications of overlooked materials," then summary judgment is not appropriate. *Valencia-Lucena*, 180 F.3d at 326 (internal quotations and citations omitted).

Before assessing the record, the Court notes that the filings are not a paragon of clarity about which aspects of the piecemeal search are presently in dispute. Rather than enumerate the issues explicitly, Plaintiff's cross-motion points to the February 13, 2018 Joint Status Report as evidence of issues in dispute with ICE. Pl.'s Mem. Opp'n 4. ICE also foregrounds this same joint status report as an accurate summation of the issues that remain disputed. *See, e.g.*, Fuentes Decl. 7 n.1 ("Defendant ICE is only addressing Plaintiff's narrowed issues stated in the parties['] Joint Status Report, filed on February 13, 2018."). The Court thus begins with this document in

order to home in on which aspects of ICE's search Plaintiff attacks as inadequate, turning first to the AOR searches (prong one) and then to the nationwide searches (prong two).

### 1. Searches Regarding AORs

In the February 1, 2018 Joint Status Report that NIJC invokes in its cross-motion, Plaintiff contests the scope of both the 2014 and 2017 searches for "[r]ecords concerning the setting and calculation of bond amounts for detainees in ICE's San Antonio and Seattle AORs." Pl.'s Mem. Opp'n 4–5. This status report identified several issues regarding the scope of the search, which Plaintiff reproduces in its opposition to Defendants' motion for summary judgment:

(1) "ICE failed to produce any communications from the Seattle AOR";

(2) "[G]aps with respect to the records that were produced for the San Antonio AOR," including the failure to produce earlier communications regarding the minimum bond rate despite production of an "email stating that the minimum bond is being lowered to $7,500, which presupposes earlier communications that set the prior minimum bond at a higher rate"; and

(3) Failure to "include[] communications involving the relevant Field Office Director, Assistant Field Office Director, and/or other supervisory officials for example with respect to any decision(s) to set certain minimum bond amounts for certain periods of time." *Id.* at 5.

In the context of the February 13, 2018 Joint Status Report, these issues reference *both* the 2014 and 2017 searches. Plaintiff's opposition only contests these issues in the context of the 2017 search. Without weighing in on the merits of the parties' litigation strategy, the Court infers that this strategy reflects late-breaking, pre-summary judgment developments. As

previously described, the supplemental search that ICE conducted in fall 2018 extended the date range of the search for "any Records concerning the setting and calculation of bond amounts for detainees in ICE's San Antonio and Seattle [Areas of Responsibility ("AORs")." Watkins Decl.; *see also* Pl.'s SMF ¶ 1. With this extension, ICE's searches in response to prong one of the 2017 FOIA request—which was in all relevant respects identical to the 2014 FOIA request—covered June 1, 2013 to August 1, 2018, and the 2017 FOIA request regarding the AORs thus swept in the entirety of the 2014 request regarding the AORs. Accordingly, in analyzing the adequacy of ICE's searches in response to prong one of NIJC's FOIA requests, the Court will consider only the 2017 FOIA request. For the following reasons, the Court finds that ICE has satisfied its burden for the searches conducted in response to Plaintiff's FOIA request for records from the Seattle and San Antonio AORs (prong one).

The agency bears the burden of showing that it acted in accordance with FOIA in a motion for summary judgment. *See Valencia-Lucena*, 180 F.3d at 326. The agency must "demonstrate beyond material doubt that its search was 'reasonably calculated to uncover all relevant documents.'" *Canning*, 346 F. Supp. 3d at 13 (quoting *Valencia-Lucena*, 180 F.3d at 325 (internal citation omitted)); *see also Morley*, 508 F.3d at 1114. Although the search need not canvass "every record system," *Marino*, 993 F. Supp. 2d at 9 (citing *Oglesby*, 920 F.2d at 68), it must include the records systems "likely to possess the requested records." *Pinson*, 177 F. Supp. 3d at 80 (quoting *Marino*, 993 F. Supp. 2d at 9 (internal citation omitted)); *see also Oglesby*, 920 F.2d at 68. In addition, to establish that the search was adequate, the agency must "set forth the search terms and the type of search performed" with specificity, *see Trautman v. Dep't of Justice*, 317 F. Supp. 3d 405, 409–10 (D.D.C. 2018) (quoting *Reporters Comm. for Freedom of Press v. Federal Bureau of Investigation*, 877 F.3d 399, 403 (D.C. Cir. 2017) (internal quotation

mark and alteration marks omitted)).  If the agency provides enough "reasonably detailed" information about the search, then the burden shifts to the FOIA requester, who must "produce countervailing evidence suggesting that a genuine dispute of material fact exists as to the adequacy of the search."  *Dillon v. U.S. Dep't of Justice*, No. CV 17-1716 (RC), 2019 WL 249580, at *5 (D.D.C. Jan. 17, 2019) (quoting *Pinson*, 313 F. Supp. 3d at 107); *see also Morley*, 508 F.3d at 1116.

Here, ICE relies on declarations to prove the adequacy of its search.  As detailed previously, ICE's discussion of its "standard procedures" for FOIA searches, *see* Fuentes Decl. ¶¶ 21–30, sets forth in broad strokes a "systematic approach to document location."  *Canning*, 346 F. Supp. 3d at 14.  ICE describes a process wherein the ICE FOIA Office determines which subcomponent program offices are likely to have responsive records, and the subcomponent offices then task individual units with executing the search.  Fuentes Decl. ¶¶ 26–27.  Applying this process to respond to prong one of the 2017 AOR searches, the ICE FOIA Office tasked the ERO Seattle and San Antonio Field Offices with conducting a search.  *See* Fuentes Decl. ¶ 42; *see also* Supp. Fuentes Decl. ¶ 10 & n.1.[10]  The agency states under sworn declaration that the ICE FOIA Office determined that these were the locations "likely to have responsive records." Fuentes Decl. ¶ 42.  Because the first prong of the 2017 FOIA request explicitly sought records

---

[10] The Court reads the first declaration as addressing the field office searches and only speaking to prong one of the FOIA request. *See* Supp. Fuentes Decl. 3 n.1 (referring to first declaration and stating, "ICE previously provided justification for the searches it conducted for Seattle and San Antonio Field Offices").  Plaintiff appears to endorse this read.  *See* Pl.'s Mem. Opp'n 12 ("ICE's Declaration of Toni Fuentes does not address the 'nationwide' scope of search but instead only focuses on the San Antonio and Seattle [AORs].").  Thus, the Court assesses only the AOR searches covered in the agency's first declaration in determining the adequacy of ICE's 2017 search in response to prong one of NIJC's FOIA request.  The Supplemental Fuentes Declaration, discussed below, addresses prong two.  *See* Supp. Fuentes Decl. 3 (detailing "ICE's Search Justification for 'Bed Mandate In General['] Relating to Plaintiff's Second FOIA Request").

regarding these field offices, the initial decision to target the ERO's Seattle and San Antonio Field Offices satisfies the case-specific "reasonableness" standard that determines the adequacy of the agency's search. *See Weisberg v. Dep't of Justice*, 705 F.2d 1344, 1351 (D.C. Cir. 1983) (quoting *McGehee v. Cent. Intelligence Agency*, 697 F.2d 1095, 1100–01 (D.C. Cir. 1983), *Founding Church of Scientology v. Nat'l Sec. Agency*, 610 F.2d 824, 834 (D.C. Cir. 1979)).

ICE's declaration also describes the searches that each of the field offices conducted. In the ERO Seattle Field Office, the Acting Field Office Director (FOD) conducted a search of his email account for the terms "detention beds" and "bed quota." Fuentes Decl. ¶ 44. Because he concluded "that all potentially responsive records relating to bond calculations were previously produced" in response to the 2014 FOIA request, *id.*, the Court will consider this aspect of the Seattle Field Office's searches (i.e., the searches conducted in response to prong one of Plaintiff's 2014 request) to make a determination about the adequacy of the parallel search conducted in response to Plaintiff's 2017 request. Upon receipt of the 2014 FOIA request, the ERO Seattle Field Office tasked the Deputy FOD, *id.* ¶ 36, who queried his email and Microsoft Outlook archive folders using the search terms "'34,000,' 'filling beds,' 'Vacant beds,' '33,400 mandate,' 'detention beds,' and 'bond amounts.'" *Id.* In addition, the Seattle Field Office tasked other individuals with further searches as part of the supplemental search conducted after ICE's litigation review. *Id.* ¶ 46. The agency states that this search covered the updated time frame of June 1, 2013 to August 1, 2018. *Id.* It involved the Acting FOD, four Assistant FODs, the Deputy Field Operation Director, and seventeen Supervisory Detention and Deportation Officers, each of whom queried their individual outlook email accounts, their individual computer folders, and the office's shared drive. *Id.* ¶ 47. The search terms used by these individuals included, but were "not limited to: 'bonds,' 'bond amount,' 'minimum bond amount,' 'bed mandate,' 'adult detention,' and 'minimum monthly bond amount.'" *Id.*

The ERO San Antonio Field Office's search similarly proceeded in several steps. The agency states that, initially, the Acting FOD searched his desktop computer, the office's shared drive, and his email account with the search terms "bond" and "bond determination." *Id.* ¶ 45. Subsequently, in response to Defendants' litigation review, the agency conducted a new search that it states covered the time frame of June 1, 2013 to August 1, 2018. *Id.* ¶ 46. The individuals who conducted this search were the San Antonio Field Office FOD, ten Assistant FODs, three Deputy FODs, and forty-seven Supervisory Detention and Deportation Officers. *Id.* ¶ 48. Each of these individuals searched their own Outlook email accounts, computer folders, and the office's shared drive with the search terms "bonds," "bond amount," "minimum bond amount," "bed mandate," "adult detention," and "minimum monthly bond amount." *Id.*

On this showing, for both the Seattle and San Antonio AOR searches, the Court finds that, although ICE's first stabs at searches involving limited personnel and search terms were plainly inadequate, the agency's "relatively detailed" description of the later search that it conducted, *see Morley*, 508 F.3d at 1116 (citation omitted), "set[s] forth the search terms and the type of search performed" with specificity, *Trautman*, 317 F. Supp. at 409–10 (citation omitted), and thereby satisfies ICE's initial burden.[11] The burden thus shifts to the FOIA requester to "produce 'countervailing evidence' suggesting that there is a genuine dispute of material fact." *See Dillon*, 2019 WL 249580, at *5 (quoting *Pinson*, 313 F. Supp. 3d at 107); *see also Morley*, 508 F.3d at 1116.

With respect to prong one of its FOIA request, Plaintiff has not provided countervailing evidence that provides a basis to deny summary judgment. NIJC's opposition does not squarely

---

[11] Moreover, in contrast to the program office searches described below, both the Seattle and San Antonio AORs used materially similar search terms to conduct their searches. *See* Fuentes Decl. ¶¶ 47–48.

address the adequacy of the search of AORs in response to Plaintiff's 2017 FOIA requests. To be sure, NIJC notes the February 13, 2018 Joint Status Report in which it asserted that there were three remaining issues: (1) the failure to produce any communications from the Seattle AOR; (2) "gaps with respect to the records" produced for the San Antonio AOR; and (3) the omission of communications involving "the relevant Field Director, Assistant Field Office Director, and/or other supervisory officials." *See* Pl.'s Mem. Opp'n 4–6 (citing Joint Status Report (Feb. 13, 2018), ECF No. 46). But intervening events bear on these assertions: The Court temporarily stayed this case to permit ICE to respond to these considerations and run additional proposed searches regarding both the San Antonio and Seattle Field Offices. *See* Unopposed Mot. to Stay, ECF No. 51; August 9, 2018 Minute Order. The question is thus whether Plaintiff's filing further speaks to the adequacy of the 2017 AOR search, beyond citing a status report that was submitted before the supplemental searches.

NIJC's opposition does not provide any evidence or, indeed, make any further argument regarding the adequacy of the AOR searches, instead focusing on the scope of ICE's search concerning the "[b]ed [m]andate [i]n [g]eneral." Pl.'s Mem. Opp'n 11. Although Plaintiff's reply suggests that there were problems with the search regarding the "Seattle Area of Responsibility—for which plaintiff specifically requested records concerning bonds," Pl.'s Reply 9, this bare assertion is unavailing for several reasons. First, Plaintiff did not previously point to any evidence or develop the argument that the Seattle AOR search was inadequate, and this Court will not credit an argument raised for the first time in a reply brief. *See In re Asemani,* 455 F.3d 296, 300 (D.C. Cir. 2006). Second, even if the Court were to credit the argument, it is not a persuasive one. Plaintiff's reply brief argues that the scope of the agency's search was inadequate "with respect to 'the bed mandate in general,'" Pl.'s Reply 6, without speaking to the

*AOR* search at any point, *see generally* Pl.'s Reply. The Court cannot take Plaintiff's citation of Seattle-area media coverage about bond problems at the Tacoma Northwest Detention Center, *id.* at 9, which Plaintiff provided in the context of contesting the second prong of its FOIA request, and read that single citation as specific evidence that creates a genuine issue of material fact regarding the adequacy of the search in response to the first prong of its FOIA request, *see SafeCard Servs., Inc.*, 926 F.2d at 1200 (quoting *Ground Saucer Watch, Inc.*, 692 F.2d at 771) ("Agency affidavits are accorded a presumption of good faith, which cannot be rebutted by 'purely speculative claims about the existence and discoverability of other documents.'"). Aside from this conclusory, unsupported argument, NIJC raises no specific argument concerning the locations searched, the personnel who conducted the search, or the search terms used. The adequacy of a search is judged by the process utilized, not the results. *Pinson*, 313 F. Supp. 3d at 108 (quoting *Ancient Coin Collectors Guild v. U.S. Dep't of State*, 641 F.3d 504, 514 (D.C. Cir. 2011)); *Jennings v. Dep't of Justice*, 230 F. App'x 1, 1 (D.C. Cir. 2007) (quoting *Iturralde v. Comptroller of Currency*, 315 F.3d 311, 315 (D.C. Cir. 2003)).

In short, with respect to prong one of the 2017 FOIA request, ICE has provided "a reasonably detailed affidavit" that sets "forth the search terms and the type of search performed" and establishes that the agency conducted a search of "all files likely to contain responsive materials." *Oglesby*, 920 F.2d at 68. NIJC has not provided specific evidence or argumentation that suggests that ICE's search concerning this prong fell short of the benchmark for the adequacy of an agency's search: "reasonableness." *Weisberg*, 705 F.2d at 1351 (quoting *McGehee*, 697 F. 2d at 1100–01); *see also Dugan v. Dep't of Justice*, 82 F. Supp. 3d 485, 494 (D.D.C. 2015) (citing *Campbell v. U.S. Dep't of Justice*, 164 F.3d 20, 28 (D.C. Cir. 1998)). Thus, the Court finds that ICE has established the adequacy of its search with regard to the 2017

FOIA request for records concerning the Seattle and San Antonio AORs (prong one).

### 2. Searches Regarding Nationwide ICE Policy

The Court now turns to the scope of the agency's search regarding "the bed mandate in general," or prong two of NIJC's FOIA request. ICE asserts that the Supplemental Fuentes Declaration details the agency's "nationwide efforts to search for potentially responsive records" and thereby "adequately demonstrate[s] that [ICE] conducted a reasonable []search." Defs.' Reply 3. Plaintiff contends that the Supplemental Fuentes Declaration is "deficient" in two regards. Pl.'s Reply 6. First, NIJC argues that ICE fails to "set[] forth the dates of the alleged searches," making it unclear what "date range" applied to each of ICE's searches. *Id.* Second, NIJC attacks ICE's failure to explain why there are "clear deficiencies in the scope of records that were released." *Id.*

Before assessing the merits of these arguments, the Court recapitulates its understanding of the time frame that applies to the second prong of NIJC's FOIA request. In contrast to prong one, for which the parties agreed to update the time frame of the search, there is no evidence in the record of a similar agreement regarding prong two, the request concerning the bed mandate "in general." For this aspect of the records request, the July 1, 2014 FOIA request sought records from January 1, 2009 to the present, Defs.' Mot. Ex. A, at 23, and the February 9, 2017 FOIA request sought records from July 2, 2014, to the present, *id.* Ex. J, at 107. Accordingly, the Court must separately assess the adequacy of each of the 2014 and 2017 FOIA requests. However, the declarations provided by the agency only speak to the program office searches conducted in response to the 2017 FOIA request, and do not address any parallel 2014 searches. *See generally* Fuentes Decl. 8–10 (discussing search conducted in response to 2014 FOIA request). As discussed below, without more detail regarding the 2014 search, the Court cannot

deem it adequate.  Furthermore, for the following reasons, the Court will deny Defendants'

motion for summary judgment regarding the adequacy of the 2017 search conducted in response

to the FOIA request for records concerning the nationwide detention policy (prong two).

As previously discussed, the agency must first "demonstrate beyond material doubt that

its search was 'reasonably calculated to uncover all relevant documents.'"  *Canning*, 346 F.

Supp. 3d at 13 (citations omitted).  If the agency meets its burden of providing "reasonably

detailed" information about the search, then the burden shifts to the FOIA requester to "produce

countervailing evidence" that suggests a genuine dispute of material fact about the scope of the

search.  *Dillon*, 2019 WL 249580, at *5 (citations omitted).  Here, the agency relies on the

Supplemental Fuentes Declaration to establish the adequacy of the search for records concerning

the nationwide bed detention policy that the agency conducted subsequent to Plaintiff's 2017

FOIA request.  *See* Supp. Fuentes Decl. ¶ 4 ("The purpose of this supplemental declaration is to .

. . address [the allegation that] . . . ICE has not provided search justifications for Plaintiff's

request for records pertaining to "Bond Mandate in General.").

ICE's supplemental declaration first references the same general search process that the

ICE FOIA Office uses when it receives any FOIA request.  *Id.* ¶ 9.  The agency then states that,

in this instance, the ICE FOIA Office determined that five program offices were "likely to have

responsive records:" the ERO, the ODPP, the Office of the Deputy Director, the Office of

Congressional Relations, and the Office of Diversity and Civil Rights.  *Id.* ¶ 10.  Two field

offices were also tasked.  *Id.*  It is not apparent from this declaration whether the Seattle and San

Antonio field offices were tasked with a search in response to prong two (nationwide policy) of

Plaintiff's FOIA request, or whether the field offices only searched for records concerning prong

one (AORs).  The second prong of the FOIA request entails a search for records regarding

policies, guidelines, or procedures related to the agency's "detention bed quota," including "all communications" related to this policy, as well as policies, guidelines, or procedures regarding the calculation of bond amounts based on vacant beds. *See* Def.'s Mot. Ex. J, at 107. As with prong one of the FOIA request, the Court finds no evidence that the agency did not act in good faith or otherwise failed to direct the search to the offices reasonably likely to have responsive records.

Moreover, the missions of the program offices tasked appear reasonably connected to this search request. For instance, ERO "oversees programs and conducts operations to identify and apprehend removable aliens," Fuentes Decl. ¶ 33, and it seems reasonable that the program office that oversees the entirety of ICE's operations to identify, apprehend, and if necessary remove detained individuals would be likely to have records related to the agency's nationwide detention policy. Along similar lines, by way of further example, the Office of the Deputy Director is responsible for the daily operations of ICE, its personnel, and its budget, Supp. Fuentes Decl. ¶ 16, and thus seems another location that is reasonably likely to possess potentially responsive records. In short, then, the ICE FOIA's decisions about which program offices to charge with conducting searches appear to reasonably target several sub-components with missions that link up to the content of the request. Particularly because Plaintiff's request did not target a sub-component of ICE, and because Plaintiffs do not at any point challenge the agency's choices about *where* to search, but rather contest *how* the agency conducted its search, the declarations thus indicate that ICE directed the offices reasonably likely to have responsive records to conduct searches.

In addition, the supplemental declaration details the searches conducted by each of the program offices tasked by the ICE FOIA Office. Searches were ultimately conducted by two of

the program offices: ERO and the Office of the Deputy Director. ERO's search involved referrals to three sub-components: ERO's Field Operations (FOPS), ERO's Custody Management Division (CMD), and ERO's Executive Associate Director's Office. *Id.* ¶¶ 12–15. Within ERO FOPS, the Unit Chief for the Domestic Operations Division searched his Outlook email account using the terms "bond calculation" and "Bed detention quota." *Id.* ¶ 13. Within ERO CMD, the Executive Associate Director determined that a search would not be "reasonably likely to locate any potentially responsive records" and "deferred" to ERO FOPS. *Id.* ¶ 15. Within ERO's Executive Associate Director's Office, the Executive Associate Director searched his Outlook email using the terms "detention bed quota," "Detention beds," "beds," "Bond Seattle," "Bond San Antonio," "Bed Quota," and Bond Calculation." *Id.* ¶ 14. Within the Office of the Deputy Director, the Deputy Director's Special Assistant searched the Deputy Director's email account for the terms "Beds," "Detention," "bed space," and "34,000." *Id.* ¶ 17. In this same office, the Special Assistant to the Acting Deputy Director also searched the Acting Deputy Director's email account for the terms "Bond Calculation," "Detention bed quota," and "Bond Calculation and Detention Bed Quota." *Id.* ¶ 18. For the other three program offices—ODPP, ODCR, and OCR—no searches were ultimately conducted. Within the ODPP, the Unit Chief determined that the ODPP was "not likely t[o] posess any responsive records," given its organizational mission, and suggested that ERO was likely to possess the requested information. *Id.* ¶ 20. The ODCR's Division Chief came to the same conclusion, *id.* ¶ 22, as did the OCR's Chief of Staff, *id.* ¶ 24.

This detailed description provides evidence that ICE's search was "reasonably calculated to uncover all relevant documents." *Canning*, 346 F. Supp. 3d at 13 (citation omitted); *see also Morley*, 508 F.3d at 1114. The agency sets forth with specificity the searches conducted within

three ERO sub-components as well as two searches within the Office of the Executive Director, in a manner that meets its burden to set forth search terms with adequate precision. Moreover, simply because three of the five program offices did not conduct any searches, it is not necessarily the case the search was inadequate. An agency does not need to search "every record system" for the requested documents, *Marino*, 993 F. Supp. 2d at 9 (citing *Oglesby*, 920 F.2d at 68). Here, individuals well-positioned to have knowledge of the program office's mission deferred to another program office, ERO, as more likely to possess the responsive records. Particularly because ERO tasked three separate sub-components with conducting a search, the Court finds this determination reasonable. The agency has thus met its initial burden.

However, Plaintiff presents other evidence that suggests a genuine dispute of material fact regarding the program office searches conducted in response to the 2017 FOIA request. NIJC specifically asserts that ICE's explanation is problematic because of, first, the failure to specify what "date range" applied to the program office searches, and, second, because of "clear deficiencies" in the records that were released. Pl.'s Reply 6. NIJC points to the headlines as support for its contentions. Given national coverage and the fact that "ICE came under great scrutiny for creating a family separation crisis" in the days leading up to August 1, 2018, yet ICE "failed to release records to plaintiff about this crisis vis-à-vis the setting of bonds," Plaintiff suggests that ICE's search must be inadequate. *Id.* at 6–10.

This argument is largely unavailing. Beyond the conclusory statement that the lack of records amounts to a "clear deficienc[y]," *id.* at 6, NCIJ does not offer any more particularized allegations. Without specific evidence of problems with, for instance, the specific search terms used or the inadequacy of the particular locations searched, however, Plaintiff's allegations amount to a "purely speculative claim[] about the existence and discoverability of other

documents." *SafeCard Servs., Inc.*, 926 F.2d at 1200 (internal citation and quotation mark omitted).

Nonetheless, the Court agrees with one part of Plaintiff's argument: ICE has not stated the time frames covered by each of the program office searches regarding the "bed mandate in general" at any point in the declarations provided.[12] To be sure, as previously noted, it is not apparent on the record before the Court that ICE agreed to update the time frame for the nationwide search (prong two) in a manner parallel to the field office search (prong one). But the lack of a specified time frame for the search conducted in response to the 2017 request for records regarding the nationwide policy still amounts to a material fact in genuine dispute that renders summary judgment inapposite.[13]

Additionally, there is another potential deficiency with the search: as previously indicated, the government's declarations suggest that the 2014 searches only included ERO and do not identify any other program offices that were tasked with a search for potentially

---

[12] As previously noted, in contrast, ICE states that the field office searches conducted regarding the records identified in the February 13, 2018 Joint Status Report covered the time frame of June 1, 2013 to August 1, 2018. Fuentes Decl. ¶ 46.

[13] Furthermore, the search conducted in response to prong two of the 2017 FOIA request used materially different search terms to seek identical information from different program offices. For instance, in a single subdivision of one program office—the Deputy Director's Office—the Deputy Director's email account was searched using the terms "Beds," "Detention," "bed space," and "34,000," Supp. Fuentes Decl. ¶ 17, but the Acting Deputy Director's email account was searched using the terms "Bond Calculation," "Detention bed quota," and "Bond Calculation and "Detention Bed Quota," *id.* ¶ 18. The disparities become even more striking when ERO is brought into the mix and the terms used are compared both within ERO and against other program offices. As compared to the Deputy Director's Office's search, ERO FOPS used a more limited search with just two terms, "bond calculation" and "Bed Detention quota." *Id.* ¶ 13. ERO's Executive Associate Director's Office, in contrast, used a relatively more expansive search with the terms "detention bed quota," "Detention beds," "beds," Bond Seattle," "Bond San Antonio," "Bed Quota," and "Bond Calculation." *Id.* ¶ 14. ICE does not explain these disparities at any point in its declarations, and until such time as the agency clarifies this matter, summary judgment regarding the adequacy of the search concerning the second prong of the 2017 FOIA request is inapposite for this further reason.

responsive records regarding the second prong of the FOIA request. *See* Fuentes Decl. ¶ 32. Although Plaintiff does not raise this point, the Court nonetheless considers it because summary judgment in a FOIA case is appropriate only if the agency first demonstrates "that its search for responsive records was adequate." *Prop. of the People, Inc. v. Office of Mgmt. and Budget*, 330 F. Supp. 3d 373, 380 (D.D.C. 2018) (quoting *Competitive Enter. Inst. v. U.S. Envtl. Prot. Agency*, 232 F. Supp. 3d 172, 181 (D.D.C. 2017)). Here, particularly because the substantively identical 2017 FOIA request ultimately tasked a number of other program offices with searching for records responsive to the same set of issues, the lack of a parallel scope of search in 2014 is suspect. Significantly, this issue is independent from question of the time frame covered by the program office search. Because the July 1, 2014 FOIA request sought records from January 1, 2009 to the present, and the February 9, 2017 FOIA request sought records from July 2, 2014, to the present, any flaw in ICE's search methodology for the 2014 request would not be remedied by a search that begins in June 1, 2013.

Summary judgment on the adequacy of ICE's program office searches regarding "the bed mandate in general" in response to both the 2014 and 2017 FOIA requests is thus denied.[14] For the reasons stated previously, summary judgment on the adequacy of ICE's field office searches regarding the 2017 FOIA requests is granted.

---

[14] The Court grants ICE leave to renew its motion for summary judgment and to file a supplemental declaration or declarations addressing the program office searches conducted in response to the 2017 FOIA requests and the scope of the program office searches conducted in response to Plaintiff's 2014 FOIA request. Any such supplementation must (1) specify the time frame used for the search; (2) justify the agency's choice to, in different program offices, use materially different search terms to locate records potentially responsive to the same request; and (3) fully elaborate the searches conducted, whether in program offices or in other locations, in response to the second prong ("bed mandate in general") of Plaintiff's 2014 request.

## B. Material Withheld by ICE

Defendant ICE's application of FOIA exemptions is also at issue in both Defendants' motion for summary judgment and Plaintiff's cross-motion for summary judgment. Although the parties' filings are at times confusing as to precisely which withholdings are contested, it is apparent that there are two discrete disputes regarding ICE's withheld material. First, Defendant ICE asserts that it properly applied FOIA Exemption 5 and FOIA Exemption 7(E) in partially withholding an intra-agency draft memorandum, the "Operational Plan for Processing and Removing Haitian Citizens Who Are Encountered at the U.S.-Mexico Border in FY 2016" ("Operational Plan"), that was attached to a potentially responsive email record. *See* Defs.' Mot. Summ. J. 15–21. ICE further asserts that the agency disclosed all "reasonably segregable" portions of this memorandum, *see id.* at 21–22, and has amply satisfied its burden by providing a *Vaughn* Index for these disputed records, *see* ECF No. 55-1. Plaintiff unsurprisingly characterizes this dispute rather differently. NIJC describes not one intra-agency memorandum, but rather refers to two "Haitian Influx Issue Paper FY16" documents that contain an "Operational Requirements" heading. *See* Pl.'s Mem. Opp'n 14; *see also* Watkins Decl. Ex. 3, ECF No. 56-5. These two documents are, according to ICE, identical. Supp. Fuentes Decl. ¶ 25. Plaintiff challenges Defendant ICE's segregability analysis for these two records and argues that the agency has failed to justify its conclusion that there are no segregable portions under the "Operational Requirements" heading present in both of these documents. *Id.*

Separately, NIJC contests ICE's "extensive redactions" in its productions of records concerning the setting and calculation of bond amounts. *See* Pl.'s Resp. Def's SMF 1. Plaintiff contends that Defendants' declarations have not "carried their burden of establishing that all reasonably segregable, non-exempt, non-privileged portions of the withheld documents were

released." *Id.* at 5.  Plaintiff thus requests that the Court order Defendant ICE to "produce a *Vaughn* [I]ndex solely for its withholdings or partial withholdings" regarding "records concerning the setting and calculation of bond amounts."  Pl.'s Reply 3 (citing Joint Status Report (Feb. 13, 2018) at 3); *see also id.* at 5 (citing same request made in email between parties on March 21, 2018, *see* Watkins Decl. Ex. B, ECF No. 62-1).  Defendants maintain that ICE consistently asked Plaintiff to produce Bates numbers for the specific documents in dispute, which NIJC failed to do.  Defs.' Reply 3.  According to Defendants, ICE determined that the disputed records likely originated from OMB and therefore requested Bates numbers to assist with identification. *See* Supp. Fuentes Decl. ¶ 6.  Because, on Defendants' account, Plaintiff has failed to identify the documents, ICE contends that it "has provided a *Vaughn* Index for the records that Plaintiff properly identified as originating with ICE."  Defs.' Reply 3–4.  For the reasons detailed below, Plaintiff has the better argument in both disputes.

    1.  Exemptions Applied to Operational Plan for Processing and Removing Haitian Citizens

        As previously described, the first dispute centers on an intra-agency draft memorandum, the Operational Plan, that was attached to email communications between senior management in the ICE Office of the Principal Legal Advisor and ERO management.  *See* Supp. Fuentes Decl. ¶ 26; *see also* Fuentes Decl. ¶ 57.  ICE avers that the Operational Plan "contains opinion and recommendations regarding ERO's proposal to accommodate the Haitian citizens subject to mandatory detention," including the estimated total cost of the proposal.  Fuentes Decl. ¶ 54.  Although the document was initially withheld in full, ICE subsequently produced a partially redacted version that invokes FOIA Exemption 5 and Exemption 7(E) for the withheld portions. *See id.* ¶ 60; Watkins Decl. Ex. 3.  The Court will now consider whether ICE has met its burden regarding the agency's application of FOIA exemptions to this memorandum.

Exemption 5 of FOIA protects "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). The Supreme Court and the D.C. Circuit have construed Exemption 5 to exempt documents "normally privileged in the civil discovery context." *Nat'l Labor Relations Bd. v. Sears, Roebuck & Co.*, 421 U.S. 132, 149 (1975); *see also Martin v. Office of Special Counsel*, 819 F.2d 1181, 1184 (D.C. Cir. 1987). Exemption 5 thus "'incorporates the traditional privileges that the Government could assert in civil litigation against a private litigant'— including the presidential communications privilege, the attorney-client privilege, the work product privilege, and the deliberative process privilege." *Brown v. Dep't of State*, 317 F. Supp. 3d 370, 375 (D.D.C. 2018) (quoting *Loving v. Dep't of Def.*, 550 F.3d 32, 37 (D.C. Cir. 2008) (internal quotation mark and citation omitted)); *see also Baker & Hostetler LLP*, 473 F.3d at 321. The agency invokes both the deliberative process and the attorney-client privilege prongs of Exemption 5 on the grounds that the intra-agency memorandum at issue involves a policy dialogue between senior management in the ICE Office of the Principal Legal Advisor and ICE ERO.

As set forth below, because it is not clear which privilege the agency seeks to apply to which part or parts of the Operational Plan, the Court will deny Defendants' motion for summary judgment regarding ICE's application of FOIA exemptions and also deny Plaintiff's cross-motion for summary judgment on this same matter.

### i. Deliberative Process Privilege

The deliberative process privilege aims to "prevent injury to the quality of agency decisions," *Sears*, 421 U.S. at 151. The privilege protects the "decision making processes of

government agencies and focus[es] on documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *Sears*, 421 U.S. at 150 (internal quotations omitted); *see also Loving*, 550 F.3d at 38 (quoting *Dep't of the Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001). It "rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news, and its object is to enhance 'the quality of agency decisions' by protecting open and frank discussion among those who make them within the Government." *Klamath*, 532 U.S. at 8–9 (quoting *Sears*, 421 U.S. at 151). Put briefly, this privilege aims to balance the merits of transparency against the concern that agencies will be "forced to operate in a fishbowl." *Petroleum Info. Corp. v. Dep't of the Interior*, 976 F.2d 1429, 1434 (D.C. Cir. 1992).

For the deliberative process privilege to apply, the record must "bear on the formulation or exercise of agency policy-oriented *judgment*." *Petroleum Info. Corp.*, 976 F.2d at 1435. An agency typically cannot withhold "[p]urely factual material . . . unless it reflects an 'exercise of discretion and judgment calls.'" *Ancient Coin Collectors*, 641 F.3d at 513 (quoting *Mapother v. Dep't of Justice*, 3 F.3d 1533, 1539 (D.C. Cir. 1993)). The party invoking the privilege must establish that the record is both predecisional and deliberative. *See Prop. of the People*, 330 F. Supp. 3d at 382. To be predecisional, a record must be antecedent to the adoption of an agency policy. *See Access Reports v. Dep't of Justice*, 926 F.2d 1192, 1194 (D.C. Cir. 1991). Although "the term 'deliberative' does not add a great deal of substance to the term 'pre-decisional,'" it essentially means "that the communication is intended to facilitate or assist development of the agency's final position on the relevant issue." *Nat'l Sec. Archive v. Cent. Intelligence Agency*, 752 F.3d 460, 463 (D.C. Cir. 2014).

Moreover, the government agency bears the burden of showing that the privilege properly applies. *See Dillon*, 2019 WL 249580 at *8 (citing *Prop. of the People*, 330 F. Supp. 3d at 380). In contrast to the agency's burden regarding the adequacy of a FOIA search, the agency's burden as to privilege "does not shift even when the requester files a cross-motion for summary judgment because 'the Government ultimately [has] the onus of proving that the [documents] are exempt from disclosure.'" *Hardy v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 243 F. Supp. 3d 155, 162 (D.D.C. 2017) (quoting *Pub. Citizen Health Research Grp. v. U.S. Food & Drug Admin.*, 185 F.3d 898, 904–05 (D.C. Cir. 1999) (internal citation and quotation marks omitted). In order to meet its burden, the agency must offer a "relatively detailed justification" of its application of the privilege. *Elec. Privacy Info. Ctr. v. U.S. Drug Enf't Agency*, 192 F. Supp. 3d 92, 103 (D.D.C. 2016) (quoting *Mead Data Cent., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 251 (D.C. Cir. 1977)). "An agency may rely on detailed affidavits, declarations, a *Vaughn* index, in camera review, or a combination of these tools." *Elec. Frontier Found. v. Dep't of Justice*, 57 F. Supp. 3d 54, 59 (D.D.C. 2014) (quoting *Comptel v. Fed. Commc'n Comm'n.*, 910 F. Supp. 2d 100, 111 (D.D.C. 2012)). "Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears logical or plausible." *Dillon*, 2019 WL 249580, at * 8 (quoting *Wolf v. CIA*, 473 F.3d 370, 374–75 (D.C. Cir. 2007) (internal quotation marks and citation omitted)).

Here, Defendants invoke the deliberative process privilege on the grounds that the Operational Plan is a non-final draft memorandum and its disclosure of the Operational Plan would "compromise[]" "the integrity of the deliberative or decision-making process within the agency." Fuentes Decl. ¶ 55. More specifically, Defendants aver that the document contains "opinions and recommendations regarding [an] ERO[] proposal to accommodate the Haitian

citizens subject to mandatory detention by identifying detention capacity of certain facilities."

Defs.' Mot. Summ. J. 15 (citing Fuentes Decl. ¶ 57). As even Plaintiff recognizes, the non-redacted portions of the memorandum confirm this description and affirm its pre-decisional status. *See* Watkins Decl. Ex. 3 ("This document outlines the operational needs of U.S. Immigration and Customs Enforcement (ICE) for a potential change in policy to detain and effectuate the removal of Haitian nationals."); *see also* ICE *Vaughn* Index, ECF No. 55-1 (noting DRAFT watermark on the document and reiterating characterization of document).

The Court thus finds ICE's justification of the deliberative process privilege to be "logical or plausible" in the manner required by this Circuit. *See Wolf*, 473 F.3d at 374–75. The declaration and *Vaughn* Index are not terribly specific, but they address "the nature of the specific deliberative process" and make clear that the document was one part of an ongoing deliberation about operational needs. *Hunton & Williams LLP v. U.S. Envtl. Prot. Agency*, 248 F. Supp. 3d 220, 241 (D.D.C. 2017) (quoting *Nat'l Sec. Counselors v. Cent. Intelligence Agency*, 960 F. Supp. 2d 101, 189 (D.D.C. 2013) (internal citations omitted)). ICE addresses the "function and significance of the document in that process," *id.*, explaining that the draft memorandum "contains opinions and recommendations regarding ERO's proposal" as well as "a proposal of an estimated total cost," Fuentes Decl. ¶ 54. Finally, ICE indicates "the nature of the decisionmaking authority vested in the document's author and recipient," *Hunton & Williams LLP*, 248 F. Supp. 3d at 241 (internal citations omitted), noting that the draft was attached to an email between ICE senior management and included legal advisors at ICE, Fuentes Decl. ¶ 54.

In short, ICE's invocation of the deliberative process privilege is justified here, and Plaintiffs raise no arguments to the contrary.[15]

## ii. Attorney-Client Privilege

In addition to invoking Exemption 5's deliberative process privilege, "ICE also applied Exemption (b)(5) to protect from disclosure subject to the attorney-client privilege." *Id.* ¶ 56. ICE applied this Exemption to withhold "portions" of the same draft memorandum. *Id.* ¶ 57. After reviewing ICE's declarations and *Vaughn* Index, the Court is left unclear as to whether the assertions of the privilege are entirely overlapping. The agency's declaration references "two documents [that] were attachments to an email communication." Supp. Fuentes Decl. ¶ 26. As previously discussed, these documents appear to be duplicate copies of the Operational Plan. ICE avers that "Exemption 5 was applied to portions of these documents because they are in draft format," such that the deliberative process privilege applies. *Id.* The agency also states that "Exemption 5 was applied to protect from disclosure communications between the agency counsel and its client." *Id.*; *see also* ICE *Vaughn* Index 1 (referencing a "draft memorandum" for which "portions" were "withheld pursuant to FOIA Exemption (b)(5) per the deliberative process privilege and attorney-client privilege"). Neither the agency's declaration nor its *Vaughn* Index explicitly state whether the agency applied the deliberative process privilege and the attorney-client privilege to the same "portions of these records," or to different portions of the records. *See* ICE *Vaughn* Index 2 ("[T]he attorney-client privilege is also applicable to the portions of these records."). Because the Court cannot conclude on the record before it that the deliberative

---

[15] Plaintiff's objection to ICE's invocation of Exemption 5 is not the invocation of a privilege per se, but rather—as discussed below—the allegation that ICE has not properly segregated potentially responsive material. *See* Pl.'s Mem. Opp'n 14 ("Two records the agency released-in-part . . . lack adequate segregability analysis and thus remain in dispute.").

process privilege and the attorney-client privilege are entirely coterminous, it will separately

consider Defendants' invocation of Exemption 5's attorney-client privilege. For the reasons set

forth below, the Court cannot conclude on the record before it that attorney-client privilege

separately shields the material.

The attorney-client privilege protects "confidential communications between an attorney

and his client relating to a legal matter for which the client has sought professional advice."

*Mead Data Cent.*, 566 F.2d at 252. The attorney-client privilege is not limited to the context of

litigation. *See id.* at 252–53. Rather, it "also protects communications from attorneys to their

clients if the communications 'rest on confidential information obtained from the client.'" *Tax

Analysts v. Internal Revenue Serv.*, 117 F.3d 607, 618 (D.C. Cir. 1997) (quoting *In re Sealed

Case*, 737 F.2d 94, 98–99 (D.C. Cir. 1984)); *see also Hunton & Williams LLP*, 248 F. Supp. at

253 (quoting *Tax Analysts*, 117 F.3d at 618); *Judicial Watch, Inc. v. U.S. Dep't of Homeland

Sec.*, 841 F. Supp. 2d 142, 153–54 (D.D.C. 2012) (citing *In re Sealed Case*, 737 F.2d at 98–99)

(discussing attorney-client privilege). A court may infer confidentiality when the

communications suggest that "the Government is dealing with its attorneys as would any private

party seeking advice to protect personal interests." *Coastal States Gas Corp. v. Dep't of Energy*,

617 F.2d 854, 863 (D.C. Cir. 1980). "Like all privileges, . . . the attorney-client privilege is

narrowly construed and . . . 'protects only those disclosures necessary to obtain informed legal

advice which might not have been made absent the privilege.'" *Id.* at 862–63 (quoting *Fisher v.

United States*, 425 U.S. 391, 403 (1976)).

Here, the contested memorandum is an attachment to an email chain between ICE

attorneys, including "senior management at [the] Office of [the] Principal Legal Advisor" and

ICE staff, "including ERO's senior management . . . and the ICE Deputy Director." Fuentes

Decl. ¶¶ 56–57.  The agency's declaration asserts that "[d]isclosure of these draft memoranda could chill future interactions and communications between agency employees and their legal counsel."  *Id.* ¶ 57; *see also* Supp. Fuentes Decl. ¶ 26.  Nothing in the Fuentes Declaration or Supplemental Declaration provides additional detail about the attachment or the email chain. ICE's *Vaughn* Index indicates that the email communication that included the attachment was "made for the purpose of securing legal advice or services, here the operational requirements such as logistics and the budget in determining the effects of [the proposed] removal process." ECF No. 55-1.

Without more, this showing does not establish that the agency can rely on the attorney-client privilege to shield the Operational Plan attached to the email.  For one, ICE does not ever state outright that one of the communicating parties was an attorney, instead resting on the implication that a communication between "senior management" at the Office of the Principal Legal Advisor and other ICE staff is necessarily one between an attorney and the agency (the client).  Furthermore, even assuming the referenced "senior management" is an attorney, there is no specificity as to whether the email communications were in fact between the attorney and the client, such that the privilege applies, or whether the attorney was merely included on communications that involved multiple other parties, such that the attorney is a passive actor and the communications are not necessarily shielded.  *See Hunton & Williams LLP*, 248 F. Supp. 3d at 254 (finding that agency did not "sufficiently explain the application of the attorney–client privilege" where "the attorney was only a participant in the email chain as a carbon-copy").

Even more significantly, the agency has failed to explain how the Operational Plan attachment relates to the overall email communication.  ICE states, to be sure, that the *email chain* to which the document was attached was "made for the purpose of securing legal advice or

services, here the operational requirements" of the agency's proposed Operational Plan.  ECF

No. 55-1.  But the agency has not provided enough detail regarding how the *memorandum* at

issue relates to a communication between the attorney and the client.  For instance, in the email

chain, was attorney input specifically sought regarding a particular item in the memorandum, and

did the attorney in fact communicate regarding this matter?  Or was the memorandum attached

on a communication with other parties, with no input from the attorney regarding the attachment

at all?  It is not clear, on the material provided.  And without a more precise articulation of the

relationship between the attachment and the legal advice sought, the Court cannot be certain that

this email chain specifically implicates the content of the memorandum as part of the

confidential attorney-client communication.  In short, the agency must establish that obtaining or

providing legal advice was a primary purpose of including the attachment with the

communication, meaning one of the significant purposes of attaching it.  *In re Kellogg Brown &

Root, Inc.*, 756 F.3d 754, 760 (D.C. Cir. 2014).  The Court thus finds that ICE has not established

that the attorney-client privilege shields the contested memorandum.

That said, because it is possible that further supplemental material could demonstrate that

attorney-client privilege applies to the Operational Plan, and because, for the reasons discussed

above, the deliberative process privilege separately supports the invocation of FOIA Exemption

5, the Court concludes that ICE may shield at least *some* of the material in this disputed

memorandum under Exemption 5.  This conclusion is of little practical moment, however.  Until

ICE provides further specification regarding which aspect of Exemption 5 it applies to which

portion of the records, the Court cannot determine whether or not the agency's invocation of that exemption is statutorily authorized for all of the information withheld.[16]

Where, as here, "'the agency fails to meet [its] burden, a not uncommon event,' FOIA provides courts 'a host of procedures' to determine whether the claimed exemption is proper, including discovery, further agency affidavits, and *in camera* review of the records in question." *Dillon*, 2019 WL 249580 at *8 (quoting *Allen v. CIA*, 636 F.2d 1287, 1298 (D.C. Cir. 1980), *abrogated on other grounds by Founding Church of Scientology of Washington, D.C., Inc. v. Smith*, 721 F.2d 828, 830–31 (D.C. Cir. 1983))). In this case, the Court believes that further agency attestation is most appropriate. Accordingly, the Court denies Defendants' motion for summary judgment regarding the contested memorandum and also denies Plaintiff's cross-motion for summary judgment on this issue, but it grants Defendants leave to renew its motion for summary judgment. If the agency so chooses, then the Court orders ICE to provide a supplemental declaration addressing the deficiencies identified here.[17]

---

[16] Until this issue is clarified, further analysis regarding the agency's application of FOIA exemptions would be speculative and premature. The Court thus defers segregability analysis regarding the agency's application of these FOIA exemptions, while recognizing that such analysis is critical before a final decision regarding the agency's invocation of any FOIA exemption. *See Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1116 (D.C. Cir. 2007) ("Before approving the application of a FOIA exemption, the district court must make specific findings of segregability regarding the documents to be withheld."); *see also* 5 U.S.C. § 552(b) ("[A]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt.").

[17] Specifically, the Court orders ICE to, in any such supplementation, clarify the following: (1) whether its invocation of deliberative process privilege and attorney-client privilege apply to the same, or different, portions of the document; (2) how the Operational Plan relates to the legal advice sought, as well as what role the attorney played in the email chain to which the memorandum was attached, to clarify how the *memorandum* itself constitutes part of "communications between an attorney and his client relating to a legal matter for which the client has sought professional advice," *Mead Data Cent.*, 566 F.2d at 252; and (3) whether any portions of the document for which it invokes Exemption 7(E) are not also withheld under Exemption 5 (whether pursuant to the deliberative process privilege, the attorney-client privilege, or both). Until such clarification is provided, the Court will defer consideration of

## 2. Exemptions Applied to Other ICE Records

In addition to specifically contesting the Operational Plan, NIJC argues that summary judgment should be denied because ICE has not adequately justified its withholdings concerning "the setting and calculation of bond amounts." Pl.'s Mem. Opp'n 10–11. This allegation centers on ICE's failure to provide a *Vaughn* Index for any potentially-responsive records other than the Operational Plan. *Id.* The disputed documents are not enumerated in Plaintiff's filings. Rather, Plaintiff points back to the February 13, 2018 Joint Status Report, quoting the following portion:

"(d) To the extent ICE disclosed records concerning the setting and calculation of bond amounts, Plaintiff has been hampered in identifying them because of the extensive redactions applied to ICE's document productions. Plaintiff requests that ICE produce a *Vaughn* Index solely for its withholdings or partial withholdings in the aforementioned categories of records concerning the setting and calculation of bond amounts." *Id.*

In reply, ICE contends that it has attempted to work with NIJC to produce a *Vaughn* Index. *See* Defs.' Reply 3. Because ICE concluded that the documents identified in the February 13, 2018 Joint Status Report "likely originated with OMB," not ICE, and because Plaintiff has not "provide[d] a list of [B]ates numbers associated with the records at issue so ICE could properly identify the disputed documents," ICE avers that "it cannot identify which ICE documents (if any)" are in dispute. *Id.* ICE thus argues that it has "provided a *Vaughn* Index for the records that Plaintiff properly identified as originating with ICE." *Id.* at 3–4. Plaintiff, in turn, argues that ICE misconstrues which party bears the burden with regard to these records, asserting that it did not commit to identifying Bates numbers within "ICE's massively redacted

---

whether it is necessary to also determine whether Exemption 7(E) applies to the Operational Plan and, if so, whether ICE has properly segregated material pursuant to 7(E).

or entirely withheld releases." Pl.'s Reply 2. Rather, according to Plaintiff, ICE had the burden

"to produce a *Vaughn* Index from which a narrower scope of disputed records could be

identified." *Id.* For the following reasons, the Court agrees with Plaintiff.

"When a federal district court reviews agency decisions to withhold information

requested through FOIA, a court can request that an agency produce a detailed 'index' of the

information withheld." *Pinson v. U.S. Dep't of Justice*, 975 F. Supp. 2d 20, 32 (D.D.C. 2013)

(quoting *Campaign for Responsible Transplantation v. U.S. Food & Drug Admin.*, 180 F. Supp.

2d 29, 33 (D.D.C. 2001); *see also Vaughn v. Rosen*, 484 F.2d 820, 826 (D.C. Cir. 1973)). Such

"[a] *Vaughn* index is an affidavit that specifically describes the withheld or redacted documents

and justifies, in detail, why each withheld record that would be responsive to the request is

exempt from disclosure under FOIA." *Campaign for Responsible Transplantation*, 180 F. Supp.

2d at 32 (citing *King*, 830 F.2d at 223-24 (D.C. Cir. 1987)). An agency does not necessarily

need to produce a *Vaughn* Index in every FOIA suit. "Rather, '[a]n agency may carry its burden

of properly invoking an exemption by submitting sufficiently detailed affidavits or declarations,

a *Vaughn* index of the withheld documents, *or both*." *Dillon*, 2019 WL 249580, at *8 n.4

(quoting *Hardy*, 243 F. Supp. 3d at 162). Regardless of *how* an agency carries its burden, the

bottom line is that, as a matter of law, "FOIA itself places the burden on the agency to sustain the

lawfulness of specific holdings in litigation." *Natural Res. Def. Council v. Nuclear Regulatory

Comm'n*, 216 F.3d 1180, 1190 (D.C. Cir. 2000); *see also* 5 U.S.C. § 552(a)(4)(B).

Thus, this Court must determine whether the material provided by the agency satisfies the

agency's burden to "demonstrate that all reasonably segregable information has been released."

*Gatore*, F. Supp. 3d at 51 (citation omitted). In this instance, because ICE has not provided a

*Vaughn* Index for any records other than the Operational Plan, the Court looks to the two

declarations that ICE offers regarding its searches and application of exemptions. The problem for ICE is that these declarations focus on the searches conducted and why the FOIA exemptions are apt, and do not at any point speak with more particularity about the nature of the redactions applied to records regarding "the setting and calculation of bond amounts." The agency's lack of "specificity," the "defining requirement of the *Vaughn* Index and [declaration]," *King*, 830 F.2d at 210 (quoting *Vaughn*, 484 F. 2d at 827), falls far short of what FOIA demands. The declarations, standing alone, do not permit the Court to conduct the de novo review required by the statute. *See Church of Scientology of California v. Turner*, 662 F.2d 784 (D.C. Cir. 1980) (discussing cases in which court denied summary judgment "based upon agency affidavits that were too conclusory or vague" to allow the court to conduct the de novo review "required by FOIA"); *see also Queen v. Gonzales*, No. 96-1387, 2005 WL 3204160, at *2 (D.D.C. Nov. 15, 2005). And because there is no *Vaughn* Index, Plaintiff has no other way to effectively test, nor can this Court independently assess, the application of exemptions to the records at issue and determine whether those exemptions are justified. Indeed, on the record before the Court, it is not even apparent how many documents were withheld in part or in full, nor is it clear which exemptions the agency invokes, for anything other than the Operational Plan. Thus, ICE has not met its burden to "sustain the lawfulness" of its "specific holdings." *Natural Res. Def. Council*, 216 F.3d at 1190.

Nor can ICE shift this burden to NIJC based on the allegation that "Plaintiff never provid[ed] a list of [B]ates numbers" to identify the documents at issue. Def.'s Reply 3. Although Bates numbers might make the agency's task easier, there is no legal requirement that Plaintiff provide this information. And although Plaintiff's references to the February 13, 2018 Joint Status Report leave more room than ideal for ambiguity and misunderstanding, when the

excerpt from that status report is read in context, NIJC does indicate which records it contests. In this joint status report, the excerpted portion regarding "the setting and calculation of bond amounts" followed Plaintiff's quotation of prong one of the 2014 and 2017 FOIA requests, which addressed ICE's San Antonio and Seattle AORs. The most logical interpretation, then, is that Plaintiff contests redactions within records that refer to "the setting and calculation of bond amounts" in the context of the San Antonio and Seattle AORs (prong one of the FOIA request). It blinks reality to conclude, as Defendants urge, that all potentially responsive records referenced in the joint status report "likely originated from OMB," Def.'s Reply 3, when the records request specifically references two *ICE* Field Offices.[18] The Court thus orders ICE to produce a *Vaughn* Index of the records that it processed and provided to NIJC after conducting updated searches regarding the AOR component of the 2017 FOIA request.[19]

### C. Material Withheld by OMB

The final issue facing this Court is whether OMB has justified its application of FOIA Exemption 5, as Defendants argue, or whether OMB has improperly withheld material, as Plaintiff contends. Defendant OMB invokes Exemption 5's deliberative process privilege to withhold in full twelve records. To meet its burden, the agency provided both a declaration and

---

[18] The Court notes, for instance, that the parties' September 14, 2018 Joint Status Report regarding the supplemental AOR searches identified 40 pages, apparently produced by ICE, with Bates numbers 2016-ICLI-00019 6937 through 2016-ICLI-00019 6976. *See* Joint Status Report (Sept. 14, 2018).

[19] As discussed previously, the supplemental search of the AORs conducted in the wake of Defendants' litigation review updated the time frame that applied to field office searches (prong one), and thereby subsumed the 2014 search. Thus, ICE's *Vaughn* Index must address the entirety of the updated 2017 search of the field offices (spanning June 1, 2013 to August 1, 2018, *see* Fuentes Decl. ¶ 46), but need not address the records produced in the original 2014 search of the Seattle and San Antonio Field Offices, except to the extent that the Seattle Field Office's searches conducted in response to the 2017 request relied upon the earlier request. *See* Fuentes Decl. ¶ 44.

a *Vaughn* Index that covers each of these records.  Plaintiff contends that OMB has not provided

adequate justification for this withholding.  *See* Pl.'s Mem. Opp'n 13.  NIJC does not offer any

specific argumentation on this point, instead invoking D.C. Circuit precedent regarding the limits

of Exemption 5 and indicating in broad strokes what an agency must provide in order to support

its segregability analysis.  *Id.* at 13–14.  For the reasons set forth below, the Court finds that

OMB has met its burden regarding segregability and may withhold these twelve records in full.

### 1.  Application of Exemption 5 to OMB Records

As previously explained, FOIA Exemption 5's deliberative process privilege aims to

"prevent injury to the quality of agency decisions."  *Sears*, 421 U.S. at 151.  It does so by

protecting "the decision making processes of government agencies," with an emphasis on

protecting "documents reflecting advisory opinions, recommendations and deliberations

comprising part of a process by which governmental decisions and policies are formulated."  *Id.*

at 150 (internal quotations omitted).  Again, for the privilege to apply, the record must "bear on

the formulation or exercise of agency policy-oriented *judgment*."  *Petroleum Info. Corp.*, 976

F.2d at 1435 (emphasis in original).  The party invoking the privilege bears the burden of

showing that the record is both predecisional and deliberative.  *See Prop. of the People*, 330 F.

Supp. 3d at 382.  To satisfy this burden, "a government agency must usually submit a

sufficiently detailed *Vaughn* index for each document and an affidavit or declaration stating that

it has released all segregable material."  *Bloche v. Dep't of Defense*, 370 F. Supp. 3d 40, 55

(D.D.C. 2019) (citation omitted).

Here, OMB has provided a declaration explaining how the deliberative process privilege

applies to each of the twelve documents.  *See* Walsh Decl. ¶¶ 11–15.  The agency has also offered

a *Vaughn* Index that discusses each of the twelve records that it has withheld under the

deliberative process privilege.  Document numbers 2, 3, 7, 9, 11, and 13 are specifically

identified as communications between OMB staff and senior OMB policy leadership or other

senior officials regarding a proposed or non-final policy option.  OMB *Vaughn* Index, ECF 54-3;

*see also* Walsh Decl. ¶ 8.  Document numbers 1, 4, 5, 8, 10, and 12 are specifically identified as

items prepared by OMB staff for senior OMB policy leadership as well as between senior OMB

leadership "in the process of preparing the President's Budget" or in other "budget formulation

activities."  OMB *Vaughn* Index; *see also* Walsh Decl. ¶ 9.  Based on these descriptions, the

Court agrees with the agency that the twelve identified documents qualify at least in part for

withholding pursuant to the deliberative process privilege.[20]

## 2.  Segregability

Before concluding that OMB's application of the exemption is proper, a separate

segregability analysis is required.  *See, e.g.*, *Johnson v. Exec. Office U.S. Att'y*, 310 F.3d 771,

776 (D.C. Cir. 2002) (citing 5 U.S.C. § 552(b) and *Mead Data Cent.,* 566 F.2d at 260).  As

indicated previously, Plaintiff contends that OMB has not complied with FOIA's segregability

requirement because "segregability is only tersely addressed" in the agency's declaration, and

the *Vaughn* Index offers no additional segregability analysis.  Pl.'s Mem. Opp'n 12–13.  NIJC

protests OMB's withholding of twelve records "*in their entirety*," *id.* at 13, arguing that OMB

has not provided "an adequate justification for concluding that there are no segregable portions"

of the twelve records at issue, *id.* at 14; *see also* Pl.'s Reply Mem. 10.  Defendants respond that

---

[20] The Walsh Declaration and the *Vaughn* Index in fact address thirteen documents.
Document number 6, titled "Secretary's Enforcement Priority Memo," was mentioned in the
body of an email that was produced but was not located in OMB's search.  *See* OMB *Vaughn*
Index 1.  Because Plaintiff does not contest the adequacy of OMB's search, the Court need not
address Document number 6 further.

OMB did in fact conduct a full segregability analysis and notes that Plaintiff "offers no specific dispute" regarding OMB's application of FOIA exemptions. Defs.' Reply 5.

The sole exemption at issue here is Exemption 5's deliberative process privilege. Invocation of the deliberative process privilege, even if justified, "does not protect documents in their entirety; if the government can segregate and disclose non-privileged factual information within a document, it must." *Loving*, 550 F.3d at 38. Because the agency "ultimately [has] the onus of proving that the [documents] are exempt from disclosure,'" *Hardy*, 243 F. Supp. 3d at 162 (quoting *Pub. Citizen Health Research Grp.*, 185 F.3d at 904–05), the agency bears the burden of establishing that it has released all nonexempt segregable information. Nonetheless, "[a]gencies are entitled to a presumption that they complied with the obligation to disclose reasonably segregable material." *Sussman*, 494 F.3d at 1117 (citing *Boyd v. U.S. Marshalls Serv.*, 475 F.3d 381, 391 (D.C. Cir. 2007)). To overcome this presumption, the requestor must provide a "quantum of evidence." *Id.* At a minimum, "[g]iven FOIA's pro-disclosure purpose," the requester seeking to rebut the presumption that the agency is due must "produce evidence that would warrant a belief by a reasonable person that the alleged Government impropriety might have occurred." *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 159 (2004); *see also Sussman*, 494 F.3d at 1117.

In this case, OMB withholds the 12 disputed documents in their entirety. The agency states that, "[i]n determining the information to be withheld, OMB staff carefully assessed whether factual or nonexempt information could be segregated and disclosed." Walsh Decl. ¶ 15. The agency further avers that it has released "[a]ll nonexempt segregable information" that was responsive to Plaintiff's requests and that "[t]he information that was withheld consists of discussions involving economic, legal, and policy issues in which facts are inextricably

intertwined with deliberative discussion, opinions, and policy recommendations." *Id.* Plaintiff offers no evidence of government impropriety beyond broad allegations that withholding documents in their entirety compels the conclusion that the agency did not properly segregate exempt from nonexempt material.

Granting the agency the presumption of regularity it is due, *see Sussman*, 494 F.3d at 1117, this Court finds that OMB has discharged its burden concerning segregability. Under the law of this Circuit, an agency is required both to provide "a statement of its reasons," and to "describe what proportion of the information in a document is non-exempt and how that material is dispersed throughout the document." *Trea Senior Citizens League v. U.S. Dep't of State*, 923 F. Supp. 2d 55, 70 (D.D.C. 2013) (quoting *Mead Data Cent.*, 566 F.2d at 261). OMB has satisfied both requirements. Its *Vaughn* Index provides a statement of its reasons for each of the documents. *See generally* OMB *Vaughn* Index. And its sworn declaration establishes how the non-exempt material relates to the exempted material by stating that any non-exempt material is "inextricably intertwined with deliberative discussion, opinions, and policy recommendations," such that "[a]ny facts in the withheld portions of responsive records . . . also qualify as privileged." Walsh Decl. ¶ 15. Exemption 5 only requires an agency to disclose non-exempt portions of a document if they are *not* "inextricably intertwined with exempt portions." *Mead Data Cent.*, 566 F.2d at 261. Here, the agency has specifically stated that they *are* so intertwined, such that it cannot disclose the non-exempt materials. Contrary to what Plaintiff contends, without a further showing of "Government impropriety," *see Nat'l Archives & Records Admin.*, 541 U.S. at 159, that NICJ does not offer and which is not apparent in the record, this explanation is an "adequate justification for concluding that there are no segregable portions of any of the twelve (12) fully-withheld records," Pl.'s Mem. Opp'n 14.

Thus, the Court concludes that OMB has met its burden regarding application of FOIA Exemption 5 and may withhold in full all twelve documents. Defendants' motion for summary judgment concerning this matter is granted, and Plaintiff's cross-motion for summary judgment regarding OMB's withholdings is denied.

## V. CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART**, and Plaintiff's cross-motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART**. An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated: September 12, 2019                                    RUDOLPH CONTRERAS
                                                             United States District Judge